**Gregory K. PREDMORE, Plaintiff,**

v.

**Glen SCHWARTZ and Bradley Lacey, Defendants.**

**No. 99–3198.**

United States District Court, C.D. Illinois, Springfield Division.

May 21, 2001.

Carl R. Draper, Kelli E. Gordon, Feldman, Wasser, Draper & Benson, Springfield, IL, for plaintiff.

William E. Jarvis, Sarah L. Pratt, Andrew M. Ramage, Ill. Atty. General's Office, Springfield, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge.

Predmore alleges that his civil rights were violated by Trooper Schwartz and Sergeant Lacey.

They were not.

Defendants' motion for summary judgment is allowed.

## I. BACKGROUND

Plaintiff Gregory K. Predmore filed the complaint in this matter on August 13, 1999. Defendants Glen Schwartz and Bradley Lacey are law enforcement officials with the Illinois State Police (ISP) who investigated allegations of sexual abuse of a minor in 1997 and 1998. At all times relevant to this action, Schwartz held the rank of trooper. Lacey held the rank of sergeant and was assigned to the general investigations unit. Plaintiff was arrested in August 1997 on charges of predatory criminal sexual assault pursuant to 720 ILCS 5/14–14.1(a)(1). On or about August 11, 1999, the Circuit Court in Pike County dismissed all charges against Plaintiff. This was premised on that court's earlier rulings granting Plaintiff's motion to suppress the minor's identification of him as suggestive and unreliable and preventing the state from using certain hearsay statements attributed to the minor during the course of the investigation.

Plaintiff then filed this action. Count I alleges a violation of his civil rights pursuant to 42 U.S.C. § 1983. Plaintiff appears to be asserting violations of his Fourth, Fifth and Fourteenth Amendment rights. More specifically, this Court in an earlier ruling noted that Plaintiff was alleging four acts which serve as the basis for his § 1983 action: (1) Defendants had no probable cause to arrest Plaintiff (Fourth Amendment); (2) Defendants seized Plaintiff's wristwatch and failed to advise him of his right to counsel before questioning him after his arrest (Fourth and Fifth Amendments); (3) Defendants ignored exculpatory evidence and used leading and suggestive photo identifications to incriminate Plaintiff (presumably Fourteenth Amendment); and finally (4) Defendants gave false testimony in pre-trial proceedings. The Court has since dismissed this final theory as a basis for Plaintiff's § 1983 action. Count II alleges a supplemental state law claim for malicious prosecution.

Before proceeding to a recitation of the facts, the Court notes that the record in this case is indeed voluminous. The memorandum accompanying Defendants' motion for summary judgment is eighty-three (83) pages. Plaintiff's response to the motion is forty-six (46) pages and Defendants' reply is twenty-nine (29) pages. More-

over, this record is supplemented by numerous affidavits, exhibits and depositions.

## II. FACTS[1]

On July 14, 1997, Defendants learned of allegations of the sexual abuse of a minor. Sergeant Lacey was assigned to assist Trooper Schwartz in the sexual abuse investigation of Plaintiff. Both Defendants reviewed the report which contained the allegations of sexual abuse before beginning any interviews. Trooper Schwartz would perform an investigation and prepare an investigation report.

On the morning of July 14, 1997, Defendants obtained a videotape of a retirement party in Griggsville, Illinois, from Jackie Taylor, who had been present at the event. Defendants on the same date interviewed Anita Andress, mother of the alleged victim. She stated that on July 12, 1997, she attended a retirement party at the Griggsville American Legion between approximately 6:00 p.m. and 8:30 p.m. with her then-boyfriend (now husband) Scott Andress and her son, B.F. (DOB 2/10/90). Eventually, B.F. went outside to play with some of the other boys at the nearby Griggsville Park. Upon his return, the parties dispute whether B.F. was acting strange or withdrawn.

Mrs. Andress indicated to Defendants that on July 13, she noticed blood stains on B.F.'s underwear. When she attempted to question him about the source of the blood, B.F. ran to his bedroom and covered up in bed. He then told her several different stories about how it occurred (bicycle accident, monkey bars, piece of concrete that he fell on). Eventually, B.F. stated to his mother that on the evening in question, he was running relay races between two telephone poles and monkey bars. When it

was time to go back inside, he was left behind with someone he referred to as "Coach." B.F.'s mother asked him if Coach had touched his bottom. B.F. responded affirmatively and held up his own index finger, apparently indicating that Coach used his index finger. His mother took B.F. to Blessing Hospital Emergency Room where a rape kit was performed. It was determined that B.F.'s injuries were consistent with sexual abuse.

Defendants next interviewed B.F. His mother was nearby in an adjacent room. The parties dispute whether Defendants were able to establish a rapport with B.F. before discussing the allegations. Plaintiff asserts that the interview process was insufficient to establish reliable information. In any event, B.F. described the events of July 12. He was outside playing in the park with seven other children. Two adults were present, one of whom was described by B.F. as "Coach." At the time, Coach was the only adult who was interacting with the children. One of the other boys outside was Brett Hendricks. B.F. indicated that Coach picked Brett up and spun him around in circles. Coach subsequently picked B.F. up and spun him in a similar manner. By this time, B.F. said that he and Coach were the only individuals present in the park area.

B.F. told Defendants that after he was spun, he felt dizzy and sat down on the swings. Coach then walked over and picked him up. B.F. indicated that Coach then placed one hand on his chest and the other on his rear end. Coach then digitally penetrated B.F.'s anus through his shorts and underwear. B.F. indicated that he told Coach to stop after the first time but this continued six or seven times.

---

1. Plaintiff has objected to a number of Defendants' undisputed material facts on the basis of hearsay, arguing that they should be stricken by the Court. In most instances, the Court disagrees. The Court will explain its rationale in a later part of this Order.

Shortly thereafter, the two went back inside the American Legion building. On July 14, B.F. described Coach as a white male with pitch black hair with white lines and wearing white shorts. He also described Coach as wearing a green and brown watch. Defendants subsequently discovered that Plaintiff did wear a green and brown watch.

After interviewing B.F., Defendants proceeded to watch the videotape which they had obtained from Jackie Taylor. Various family members were present at this time, including Anita Andress, Anita and Harley Whitlock (B.F.'s grandparents), Scott Andress (B.F.'s mother's boyfriend) and Jon F. (B.F.'s father). Before viewing the videotape, Harley Whitlock informed Defendants that he and Jon had been to the Edwin Predmore residence the previous day where they spoke with Edwin Predmore (Plaintiff's father), Plaintiff and Plaintiff's brother. Mr. Whitlock further informed Defendants that he had told the Predmores that someone referred to as Coach had hurt his grandson on the previous day. Edwin Predmore indicated to Mr. Whitlock that his son Greg was "Coach" but that Greg did not do this.

The videotape was played for B.F. on two occasions on July 14. B.F. did not indicate that he saw Coach. This is true even though Plaintiff did appear in the videotape. Prior to viewing the videotape, neither Defendant was familiar with Plaintiff.

On July 14, Defendants also interviewed Brett Hendricks. Brett told Defendants that while at the party, he was outside playing in the park with the other kids. He also informed Defendants that Plaintiff was the only adult interacting with the kids. Specifically, Plaintiff would help the kids run relay races. Moreover, Brett indicated that Plaintiff picked him up and spun him around in circles while holding him above his head. Brett further stated that while walking back toward the building, he noticed Plaintiff spinning B.F. above his head. Brett described Plaintiff as having black hair with gray on the sides and wearing a black shirt on July 12.

Trooper Schwartz interviewed Plaintiff on July 14. He indicated that he had attended the retirement party with his family two days earlier. Plaintiff stated that he went outside with his sons Greg, Jr. and John at approximately 6:30 or 6:45. According to Plaintiff, the following people were outside at the time: Greg Predmore, Jr. (age 14), John Predmore (age 11), Lucas Predmore (age 11), Rachael Predmore (age 1), Josh Taylor (age 10), Robbie Taylor (age 6), Brett Hendricks (age 7), two other boys he was unsure of, and Plaintiff's brother David Predmore. Plaintiff further indicated that his wife Claudia and his brother's wife Linda also came outside.

Plaintiff told Trooper Schwartz that he was the only adult interacting with the kids at the time. Plaintiff stated that he set guidelines as to where the children could play. He also "timed" some of the kids as they went through the monkey bars and administered relay races involving running to a light pole. Plaintiff indicated that during the last relay, one of the kids whose identity he was unsure of went to the bathroom. After the final race, everyone proceeded back toward the legion hall. Plaintiff further stated that he stopped near the monkey bars in order to spin some of the children on his shoulders. He indicated that he spun his son, Brett Hendricks, and one or two kids who he did not know by name. Plaintiff said that he spun them across his upper back in a manner similar to a fireman's carry. Trooper Schwartz indicated that when asked about the swings, Plaintiff acted in a nervous manner by looking away and moving his left arm. Plaintiff stated that at no

time did he push anyone on the swings and that his wife was 100 feet away from him while in the park. Moreover, Plaintiff said that he did not know who B.F. was. Plaintiff also said that although he was Josh Taylor's youth basketball coach, he did not hear anyone refer to him as "Coach" on that date. Plaintiff indicated that he left the legion building at approximately 8:15 p.m.

On July 14, Defendants also interviewed Jon F., B.F.'s father. He indicated that he and Mr. Whitlock went to the home of Mrs. Zoe Predmore to find out who had been at the party. While there, Jon indicated that he encountered Plaintiff and his wife. When Jon informed them that B.F. had mentioned something about Coach, Claudia Predmore made the following statement: "That is my husband. That could not be." Moreover, Plaintiff indicated "I'm the one they call Coach; I didn't do this." According to Jon, Plaintiff also stated "I believe your son fell down while he was there" and "It may not have happened there; were you with him all day? It could have happened before or after the party." Jon also told Defendants that Plaintiff appeared to be very nervous and failed to make eye contact.

On July 15, Defendants obtained photos from a local shop in order to compile a photo lineup to present to B.F. Defendants met with State's Attorney Brett Irving on the same date. After examining the photo lineup, Irving determined that it was acceptable to be presented to the minor.

On the same date, Joshua Taylor (age 10) was interviewed by Defendants. He told them that he was one of the kids playing in the park near the American Legion. He indicated that Plaintiff and David Predmore were the only adults and that there were seven other children who were outside. Josh noted that David Predmore stayed off to the side with a small female child while Plaintiff interacted with the children by running relay races and setting boundaries. He also stated that Plaintiff spun Brett Hendricks and B.F. on his shoulders. Moreover, Josh indicated that he had told Brett Hendricks that he referred to Plaintiff as "Coach" from having coached Josh's youth basketball team. Josh also said that Brett told B.F. that Plaintiff was "Coach." Josh's brother Robbie (age 6) was also interviewed on the same date. Robbie also indicated that he was playing in the park on the evening of the retirement party. He also stated that he saw Plaintiff playing with the kids and witnessed his spinning Brett Hendricks and B.F. on his shoulders.

On July 15, Defendants presented the photo lineup that had earlier been approved to B.F. at his home. B.F. reiterated that he understood the difference between the truth and a lie and a good and bad touch. B.F. again stated that Coach spun him on his shoulders after spinning Brett Hendricks. He once again described Coach as being a white male with pitch black hair, a black shirt, white shorts and a green and brown watch. Moreover, B.F. confirmed that Coach had digitally penetrated his rectum on six or seven occasions while he was on the swings. The pictures were laid out upon the kitchen table at B.F.'s home. B.F. was instructed to be certain before identifying the individual who hurt him assuming that person was present in the lineup. B.F. selected the individual that had been previously identified to Defendants as "Coach."

■ The following week, Trooper Schwartz made arrangements to obtain the medical records from Dr. Ayca Raif's office and Blessing Hospital. He received those records a few days later. Dr. Raif's records indicate trauma to the anal region consistent with digital penetration. On

July 22, Defendants learned that the results of Plaintiff's first polygraph test were inconclusive. On August 1, Schwartz was notified that the results of Plaintiff's second polygraph indicated deception as to whether or not he had assaulted B.F.[2]

On August 12, 1997, Trooper Schwartz met with Pike County State's Attorney Brett Irving in regard to obtaining an arrest warrant for Plaintiff. On the same date, the State's Attorney assisted Trooper Schwartz with the preparation of a probable cause affidavit that would later be presented to a judge. At the time, Irving indicated that he was of the opinion that it was sufficient to establish probable cause to arrest Plaintiff. Judge David Slocum subsequently signed an arrest warrant for Plaintiff. Trooper Schwartz alone arrested Plaintiff on the same date.

Plaintiff was booked at the Pike County Sheriff's Office. Trooper Schwartz seized a green and brown watch at Irving's direction and issued an evidence receipt to Plaintiff. This was the watch that Plaintiff had been wearing on July 12 while playing with the children. None of the conversations that Plaintiff had with Trooper Schwartz at the county jail were used against him in court. Trooper Schwartz indicated that he did not give Plaintiff his *Miranda* warnings because he did not interrogate him. The parties dispute whether either Defendant ever threatened Plaintiff. Plaintiff essentially asserts that he was "threatened" in that the officers prohibited him from taking notes and implied that he would be deemed uncooperative if he was unwilling to proceed without an attorney. Moreover, there is a dispute in the record as to whether Plaintiff's family ever offered any evidence of an exculpatory nature to either Defendant or whether the Defendants were aware that such evidence existed.

On August 13, Trooper Schwartz continued the investigation by interviewing Rita Whitlock, B.F.'s grandmother. She and her husband had attended the retirement party on July 12 between approximately 6:00 and 8:30. Mrs. Whitlock noticed that before going outside to play with the other children, B.F. appeared to be acting normal. She further stated that upon his return inside, B.F. walked past his grandfather without saying a word and then crawled under tables until he reached her and hung on to her without saying anything for several minutes.[3] She indicated that this was not normal behavior for B.F.

The following morning, B.F.'s mother called Mrs. Whitlock and said, "Something happened to B.F." While at the doctor's office, Mrs. Whitlock told B.F. to tell his grandfather who it was. Later, B.F. told his grandmother that it was Coach and that Josh and Brett knew his name. On August 13, B.F. described Coach to his grandmother as he had before. He also indicated that Coach swung Brett and then himself and that it happened over near the swings. B.F. also stated that he hollered for help but that no one heard him.

---

2. Plaintiff contends that the polygraph evidence constitutes inadmissible hearsay and cannot be used in considering this motion. However, as a matter of federal law, polygraph results are one of many factors which may be used in determining whether, from an objective viewpoint, probable cause for an arrest exists under the Fourth Amendment. *See Booker v. Ward,* 94 F.3d 1052, 1058 (7th Cir.1996) (relying on polygraph results as one factor in the probable cause analysis).

3. Plaintiff disputes this characterization of B.F.'s behavior by referring to two individual frames of the videotape which shows B.F. in a "playful mood that was neither strange nor withdrawn." However, this does not mean that B.F. did not walk past his grandfather, crawl under tables and then cling to his grandmother.

Trooper Schwartz also interviewed Scott Andress on August 13. At the time, he was B.F.'s mother's boyfriend. He is now her husband. On the afternoon of July 12, B.F. had been boating with Andress and others on the Illinois River. B.F. then went with Andress to his residence to get cleaned up for the party. B.F. took a bath and dressed himself for the party. Andress noticed nothing out of the ordinary. It was then that B.F. put on the clothes and underwear that he was wearing during the retirement party. While at the party, Andress indicated that B.F. had asked him at approximately 7:00 if he could go outside to play. Andress told B.F. that he could go outside. At about 7:30, Andress went outside to check on B.F. and noticed a number of kids on the picnic table at the far end of the park. After he saw that they were okay, Andress went back into the building. Shortly thereafter, Andress observed B.F. reenter the building and walk past his grandfather without saying a word. He then observed B.F. crawl under two tables and then crawl up on to Mrs. Whitlock's lap. After watching the movie, Andress left with B.F. and his mother. He dropped them off at their residence and did not see them again until the next day.

On August 20, Trooper Schwartz re-interviewed B.F. at Griggsville Park where the assault allegedly occurred. The parties dispute whether Trooper Schwartz did a sufficient job of establishing a rapport with the minor. In any event, B.F. showed him where Coach spun him on his shoulders near the teeter-totters. B.F. also showed him the swing where Coach had "bad touched" him. The child reiterated that Coach was the one who digitally penetrated his rectum.

On September 16, Trooper Schwartz interviewed Thomas Wainman. Wainman had been present at the retirement party.

He also indicated that Plaintiff was a good friend of his. Wainman stated that Plaintiff appeared to be very uptight and preoccupied during the slides and movies at approximately 8:00 on July 12. He further said that Plaintiff was not acting like himself and was normally an outgoing person.

On December 18, 1997, State's Attorney Irving and Trooper Schwartz attempted to re-interview B.F. He verbalized very little to the two and appeared to be very uncomfortable discussing the alleged sexual assault. On this occasion, B.F. said that Coach picked him up and "bad touched" him in his front, pointing to his penis area. Trooper Schwartz asked B.F. if he was telling the truth now or before. B.F. stated that he told the truth before and did not want to discuss it now. Trooper Schwartz indicated that B.F. appeared to be very uncomfortable discussing the incident.

On December 18, Defendants and Trooper Jeff Jacobs also interviewed Tamie Pool, the social worker at B.F.'s school. She stated that she met with B.F. at the request of his mother on August 29 to discuss the incident of July 12. Pool said that B.F. was reluctant to talk about the incident. After a couple of meetings, she noted that B.F. finally opened up. B.F. told her that he became dizzy after being spun around and sat down while the other children went inside. B.F. indicated that Coach then took him back to an area by a fence and put his hand down the back of his pants, digitally penetrating B.F.'s anus. B.F. further told Pool that when he went home, his mother saw the blood in his underwear. Pool stated that B.F. has indicated that he knows the difference between good touching and bad touching and that the incident in Griggsville Park is considered bad touching. She also said that B.F. mentioned that he wanted others

to testify for him in court because he wanted it to go away.

On December 20, Trooper Schwartz interviewed Dr. Mark J. Schaadt who had provided medical care to B.F. on July 13. Dr. Schaadt indicated that B.F. made no statements about the cause of the injury and would not answer any questions, appearing both shy and embarrassed. Dr. Schaadt stated that the information he received came from B.F.'s mother. He informed Trooper Schwartz that his findings resulting from the examination of the anal region of B.F. were consistent with sexual assault to the anus and anus manipulation. Dr. Schaadt further indicated that the injuries were consistent with injuries caused by a finger being inserted into the anus through the underwear and shorts. Moreover, when asked whether such injuries could have been caused by falling from monkey bars, a bicycle accident or falling down on a piece of concrete, Dr. Schaadt responded that he had never seen the type of injury that B.F. had from any of those sources. Additionally, Dr. Schaadt stated that the chances of such an injury occurring from falling on monkey bars or a bicycle accident was so remote that it could hardly be considered.

Trooper Schwartz next interviewed Kelly Winston, a nurse who had provided medical care to B.F. at Blessing Hospital on July 13. She stated that B.F. appeared to be "clingy to his mother, reserved, withdrawn and embarrassed" when he came to the hospital. Initially, B.F. would not answer any questions regarding the assault and the information was obtained from his mother. Eventually, B.F. told her that "someone hurt me" and "it happened by the jungle gym in Griggsville Park." B.F. provided the same description of the suspect to Nurse Winston that he had earlier given to others. She further indicated that B.F.'s mother had stated that B.F. did not have a bath or change his underwear after the alleged assault and before the examination. Nurse Winston also noted that B.F.'s underwear and shorts fabric were not damaged other than the spot of blood, indicating no trauma to the fabric from a fall.

On December 21, Trooper Schwartz interviewed Harley Whitlock, B.F.'s grandfather. Mr. Whitlock indicated that B.F. came into the legion hall and walked past him without saying a word, despite his having spoken to B.F. He further stated that B.F. crawled under tables until he reached his grandmother and sat on her knee. Mr. Whitlock told Schwartz that his wife had commented on the way home that she felt B.F. was playing too hard because he was hot and sweaty and that he was not acting like himself. The following morning, B.F.'s mother called and indicated that she had found blood in B.F.'s underwear and thought that he had been molested. Mr. Whitlock stated that he subsequently called Bob Predmore and told him what B.F.'s mother had said. Soon thereafter, Edwin Predmore (Plaintiff's father) called Mr. Whitlock and reassured him that no molestation took place and that his two boys (Greg and David) and their wives were in the park watching the kids. Mr. Whitlock soon learned that it was "Coach" who allegedly hurt B.F. On July 13 at around noon, Mr. Whitlock went with B.F.'s father to Edwin Predmore's house to find out who "Coach" was. Mr. Whitlock informed Schwartz that he asked the Predmores, "Who is the coach?" Edwin Predmore responded, "That is my son; he did not do it." A woman said, "That is my husband; I'm going to go get him." Mr. Whitlock indicated that when Plaintiff and his wife returned, Plaintiff spoke briefly with Jon F. Mr. Whitlock stated that Plaintiff became defensive and said things such as "Were you with him all day" and "I'll take any test."

On December 22, Trooper Schwartz interviewed Dr. Ayca Raif. She informed him that on July 13, she received a call from B.F.'s mother who told her that she had found blood in her son's underwear and thought that he might have been molested. Dr. Raif subsequently examined B.F. She discovered that the injuries that B.F. had were consistent with allegations that his rectum was penetrated with a finger through the underwear and shorts. Dr. Raif further stated that she was almost positive that B.F. had been sexually assaulted. On the date of the examination, B.F. had told Dr. Raif that he fell off the back of a bicycle onto concrete. Dr. Raif informed Trooper Schwartz that B.F.'s injuries could not have been caused in such a manner.

On January 22, 1998, Trooper Schwartz interviewed Michelle Logan. She told him that on July 12, 1997, she was attending church with Jon F., who was her boyfriend at the time and is now her husband. At approximately 11:20 a.m., she received a call from B.F.'s mother requesting that she and Jon come to Dr. Raif's office. Ms. Logan told Trooper Schwartz that B.F. was not acting like he normally did and was very quiet. Later that afternoon, B.F.'s grandmother asked him who it was that had hurt him. Ms. Logan heard B.F. respond that it was "Coach." She further heard B.F. describe Coach by saying "pitch black hair with gray on sides," "wasn't long, shorter than Scott's," "green and brown watch," and "black and white striped shirt and white shorts."

On January 22, Trooper Schwartz also interviewed Sandy Henry, who is Scott Andress' mother. Ms. Henry indicated that she had received a call from B.F.'s mother on the morning of July 13. Upon arriving at B.F.'s home, Ms. Henry found B.F. to be acting withdrawn, nervous and shook-up. He was completely covered up in bed. Ms. Henry indicated that B.F. did not want to get looked at by anyone. She stated that when B.F. moved about in bed, she noticed the spot of blood in the rear of his underwear.

The parties dispute whether Defendants were aware of any evidence given to them or others involved in the investigation or whether any such evidence was withheld from Plaintiff or members of his family which would have established the falsity of the allegations against him in *People of the State of Illinois v. Gregory K. Predmore*, Pike Co., No. 97–CF–57. Plaintiff contends that he offered Defendants the clothing that the videotape confirmed he was wearing at the retirement party. He was wearing a black White Sox tee shirt with a large number on it. The shirt had a small white band at the end of each sleeve but no stripes. Moreover, Plaintiff contends that the videotape had recorded B.F. playing with other children and not acting withdrawn after coming inside. Additionally, Plaintiff contends that Defendants were aware that he had an injury on the finger that he is accused of using to assault B.F. which is directly inconsistent with the allegations made against him. Plaintiff also suggests that Defendants should have investigated the possibility of a sexual assault at the hands of Jon F. in that the child was alone with him prior to the party and given a bath by him.[4] Finally, Plain-

---

4. Plaintiff cites absolutely no authority for his assertion that B.F. was given a bath by his father prior to the retirement party. The record indicates that B.F. was with Scott Andress prior to the party. The record also indicates that Andress took a shower and B.F. took a bath and that B.F. then dressed himself. Moreover, despite the voluminous record in this case, the Court is unaware of any evidence whatsoever suggesting that an assault took place at this time. Perhaps this

tiff emphasizes the fact that a child not known to Plaintiff had gone to the bathroom around the time of the alleged incident in the park.[5]

The parties dispute whether State's Attorney Brett Irving was given and had an opportunity to examine all of the evidence collected in the criminal investigation. Plaintiff contends that Irving was not provided with the aforementioned evidence which tended to negate his guilt or probable cause for his arrest. The parties dispute whether Defendants were of the belief that probable cause existed for the arrest and continued prosecution of Plaintiff. Plaintiff contends that Defendants had no reasonable basis upon which to believe that probable cause existed due to their failure to conduct an adequate investigation that did not include using suggestive and leading interview techniques and their deliberate refusal to consider the previously mentioned important evidence. Regarding the advice of the State's Attorney on the propriety of the photo lineup, Plaintiff makes the same assertion.

At all relevant times during the prosecution of Plaintiff in *People of the State of Illinois v. Gregory K. Predmore,* Pike Co., No. 97–CF–57, Irving was the State's Attorney of Pike County and therefore responsible for the prosecution. Irving has been in that position for twelve years and has prosecuted multiple sexual abuse cases. He had worked with both Defendants on many occasions prior to the prosecution of Plaintiff. Irving filed criminal charges, via information, against Plaintiff on August 12, 1997, for the following offense: Predatory Criminal Sexual Assault of a Child, in violation of 720 ILCS 5/12–14.1(a)(1). The State's Attorney had previously met with Defendants on several occasions to discuss the allegations of sexual abuse and the evidence that had been collected. On July 15, 1997, Irving met with Defendants to discuss and construct a photo lineup which would be presented to B.F. Irving saw each of the photos which were selected by Defendants to be used in the lineup. It was his opinion that the lineup was not unduly suggestive.[6] The State's Attorney was aware that B.F. had been presented a videotape of the retirement party and was unable to identify the man he had earlier described as "Coach." Prior to the arrest of Plaintiff, Irving viewed portions of the videotape in the presence of Defendants. The parties dispute whether the person identified in the video as Plaintiff appeared to closely resemble the description given by B.F. At the time of Plaintiff's arrest, the State's Attorney was aware that B.F. had initially denied that the offense had occurred and had offered various explanations such as having fallen off his bike, concrete or monkey bars. Irving was also aware of the fact that B.F. had been asked on numerous occasions words to the effect of "who hurt you."

The State's Attorney was also aware of the extensive evidence collected by Defendants which in his view corroborated B.F.'s allegation that an individual named "Coach" digitally penetrated B.F.'s rectum six or seven times while he was playing in Griggsville Park on July 12, 1997.[7] The

---

explains why Defendants did not pursue this avenue.

5. The Court is uncertain as to how this would establish the falsity of the allegations against Plaintiff.

6. Plaintiff indicates that he disputes this material fact. However, the reason he gives pertains to whether or not probable cause exists and not whether the lineup was suggestive. Plaintiff's alleged reason is therefore non-responsive.

7. Plaintiff objects to this fact as being immaterial to Defendants' motion apparently because of the state court's decision barring all identi-

evidence included B.F.'s mother finding blood on his underwear near his bottom and B.F. making the statement that, "I'll kill anyone that touches my bottom," before being taken to the doctor on July 13. Additionally, B.F. indicated on at least two occasions prior to Plaintiff's arrest that Coach had digitally penetrated B.F.'s rectum six or seven times. Several of the other boys corroborated B.F.'s account that Coach first spun Brett Hendricks on his shoulder before spinning B.F. Moreover, Plaintiff's father, wife, Brett Hendricks and Plaintiff himself all admitted that Plaintiff was "Coach." B.F. indicated to several people that it was Coach who hurt him and gave a verbal description of him and even drew a picture. The physical description given by B.F. of Coach was very similar to that of Plaintiff. Additionally, B.F. picked Plaintiff out of the photo lineup presented to him by Defendants. Plaintiff also failed his second polygraph test given by the ISP.[8] This is just a portion of the evidence that Defendants claim established probable cause.

Trooper Schwartz met with Irving prior to the arrest of Plaintiff. The State's Attorney assisted with the preparation of the probable cause affidavit and was of the opinion that the evidence was sufficient to support a finding of probable cause for the criminal charge. The probable cause affidavit was presented to the Honorable David Slocum on August 12, 1997. Judge Slocum determined that probable cause existed and issued an arrest warrant for Plaintiff for the offense of Predatory Criminal Sexual Assault. On October 20, 1997, a preliminary hearing was held before the Honorable Richard G. Greenlief. Irving was responsible for the presentation of the State's case against Plaintiff. At the conclusion of the hearing, Judge Greenlief determined that probable cause existed to bind Plaintiff over for a criminal trial.[9]

After Plaintiff's arrest, Irving was presented with the following interviews: Rita Whitlock, Scott Andress, Jon F., B.F. (8/20/97), Thomas Wainman, B.F. (12/18/97), Jody Figge, Michelle Elliott, Deana Graham, Carla Brackett, Dr. Mark Schaadt, Kelly Winston, Harley Whitlock, Dr. Ayca Raif, B.F. (12/31/97), Michelle Logan and Sandy Henry. The State's Attorney participated in the final two interviews with B.F. He also participated in the questioning of all witnesses at the pre-trial hearings. Irving at all times between the date of arrest until the conclusion of pre-trial hearings believed that there was probable cause that Plaintiff had committed the offense for which he was arrested. He was not aware of any evidence that had been withheld from him by Defendants during the course of the investigation.

fication of Plaintiff. The Court disagrees. The evidence collected by Defendants goes to the issue of whether or not probable cause to arrest Plaintiff existed.

8. Plaintiff contends this last statement is immaterial in that under Illinois law, polygraph results are not admissible in evidence and cannot form the basis of probable cause. Plaintiff is reminded that he is now in federal court and that at least one of his claims involves only federal law.

9. Plaintiff objects to this as immaterial in that the preliminary hearing was based entirely on the hearsay declarations of Trooper Schwartz. It was ultimately determined that the hearsay statements of the minor and his identification of Plaintiff in the photo lineup would be suppressed at the criminal trial. This Court has already indicated that it would consider the statements that are objected to on the basis of hearsay. The Court will elaborate on this in a subsequent section of the Order. The short answer, however, is that this Court is not considering the statements for the truth of the matter asserted. Therefore, the statements do not constitute hearsay.

After the preliminary hearing which established that probable cause existed to bind Plaintiff over for trial, hearings were held on various dates to rule on the admissibility of certain statements of B.F., who was unavailable to testify. On September 9, 1998, Judge Greenlief ruled that the statements of B.F. were inadmissible.

This action was filed on August 13, 1999. Plaintiff had no reason to believe that either Defendant had any animosity toward him before investigating this incident. Prior to the investigation, Plaintiff did not know either Defendant. Before the investigation, neither Defendant had a negative opinion about the Predmores. Plaintiff was born on September 26, 1962. B.F. was born on February 10, 1990. B.F.'s injuries were consistent with digital penetration.

In his response, Plaintiff has advanced certain material facts which he claims defeat the instant motion. Plaintiff asserts that Robert A. Lucas is an expert witness in the area of police/investigative procedure and interviewing and interrogation. Mr. Lucas questions the practices of the ISP in the criminal investigation. He contends that neither officer was qualified to serve as lead investigator. Mr. Lucas further asserts that the officers' notes should not have been destroyed in that they were likely more complete than the reports that were prepared. He is especially critical of Defendants' failure to preserve the notes of the interviews with B.F. He further asserts that the evidence was not properly presented to the State's Attorney. Mr. Lucas also questioned why the child was interviewed in the presence of family members. He opined that it is possible that B.F. was merely telling Defendants what they wanted to hear so that they would go away. Because of these deficien-

cies, the State's Attorney could not properly characterize the evidence for the judge who would make the probable cause determination. Moreover, Mr. Lucas further questions the likelihood of the judge knowing what the photo array actually looked like.[10] Mr. Lucas also questions why Defendants did not follow up on the victim screaming for help at the time of the alleged offense. He also contends that the officers should have realized the possibility that B.F.'s identification of his assailant could be tainted. Finally, Mr. Lucas opines that it appears that the officers were not in a position to know whether the individual they proposed to arrest had committed a crime or not.

Plaintiff also advances the opinions of Dr. Georgia Davis, a trained psychiatrist. Dr. Davis contends that when Defendants first interviewed B.F., the child was not yet ready to proceed. Because a rapport had not yet been established, this type of questioning was too intense and premature. Moreover, it was a "tactical error" to move B.F. to the family room and have family members present and speaking during the playing of the video. Dr. Davis further asserts that it appeared as though the officers were in control and set the pace for the first interview with B.F. even though the child should typically set the pace. Additionally, because the records involve only summaries of the interview, they are not complete. Furthermore, there is no indication of B.F.'s mental status or emotional state at the time of the interview. Dr. Davis also criticizes the fact that so many leading questions were used by Defendants in questioning the seven-year old child. Moreover, they should not have informed him that they had already heard his story. Dr. Davis also maintains that an audio or video cassette

10. The Court questions the relevance of this fact. It is the Court's understanding that B.F.'s identification of Plaintiff was suppressed in the criminal matter.

should have been used in interviewing B.F. She also opines that the officers should have followed up on the child's description of Coach. Finally, Dr. Davis argues that the officers left out much detail that could have been used in the identification.

Judge Greenlief determined in the criminal matter that Defendants asked many suggestive and leading questions. For example, one of the first questions in the initial interview was "Tell us what you told your mother" instead of "Tell us what happened." Moreover, Judge Greenlief thought that Trooper Schwartz used inaccurate language when presenting the photo lineup to the minor. Specifically, he thought that the questions asked regarding the photo array were suggestive as to whether the alleged perpetrator was actually in the photo display. Judge Greenlief determined that this was totally inappropriate. He further believed that the officers never gained control of their investigation. Judge Greenlief found that during the photo array, B.F. had possibly been pre-conditioned by viewing the videotape first and by hearing the statements that were made during the presentation. He therefore suppressed the identification of Plaintiff in the photo array.

The parties dispute whether Trooper Schwartz had a general discussion with the medical personnel in this case. It is clear that he reviewed the medical reports which suggested that B.F.'s injuries were consistent with the digital penetration of his rectum. Moreover, it is also undisputed that Trooper Schwartz interviewed the medical personnel involved in this case. Plaintiff's assertion that he did not have a general discussion with the medical personnel therefore strikes the Court as vague. It is also true that B.F. at times gave different accounts as to the source of his injuries, such as falling on the monkey bars or falling off of a bicycle. The parties dispute as to whether B.F. answered questions with "I don't know" while in the emergency room or denied that anyone touched him. Once again, the exhibit referred to by Plaintiff indicates that B.F. gave several different accounts as to what happened and was reluctant to discuss the incident. The parties also dispute whether the medical records stated that there had been "trauma." [11]

It is clear that Trooper Schwartz sometimes employed leading and suggestive questions in discussing the alleged incident with the seven year old. Specifically, he asked B.F. to tell him what he had told his mother. Moreover, Defendants questioned whether the seven-year old knew the difference between the truth and lies and good and bad touches.

The parties dispute whether Trooper Schwartz asked Plaintiff about his wrongdoing on the date of his arrest. He admitted that he probably did ask Plaintiff about his alleged wrongdoing without having given him *Miranda* warnings. However, it is undisputed that no incriminating statements were used against Plaintiff.

Plaintiff also states that the officers had taken notes on the photo lineups but later destroyed the notes. Moreover, none of the people in the lineup other than Plaintiff were in the park on that date. Plaintiff's shorts on the video were light tan/khaki. Plaintiff also emphasizes that Sergeant Lacey told B.F. during the initial interview that he had already talked with

11. The specific exhibit referred to by Plaintiff does not use the word "trauma." However, that same exhibit does indicate "suspicion of sexual abuse." Moreover, although the affidavits of B.F.'s examining doctors do not use the word "trauma," they also found that there was "suspicion of sexual abuse." Thus, the Court questions the significance of the medical records not indicating that there was trauma.

his mother and that his mother had said that something had happened to him while at Griggsville Park. Sergeant Lacey told the child to share that information with him. Plaintiff questions this interview technique.

On September 9, 1998, Judge Greenlief ruled that the statements of B.F. were inadmissible in the criminal trial. Because B.F. was unavailable to testify, it was presumably at this point that the criminal charge against Plaintiff was dismissed. The instant action was filed on August 13, 1999.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "metaphysical doubt" will not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant must point out those parts of the record which demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the record is viewed in favor of the non-moving party and all reasonable inferences are to be drawn in favor of that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. ANALYSIS

Defendants have advanced several arguments as to why they are entitled to summary judgment: (1) Plaintiff's § 1983 action is barred by the two year statute of limitations; (2) Plaintiff's Fifth Amendment right to counsel never attached because he was never under custodial interrogation; (3) Sergeant Lacey lacks the requisite personal involvement in the arrest of Plaintiff to be a Defendant in the instant matter; (4) because Plaintiff was arrested pursuant to a valid warrant, no cause of action may lie under § 1983 for a Fourth Amendment violation or for a state law malicious prosecution claim; (5) because probable cause was determined by Judge Greenlief at a preliminary hearing, Defendants are entitled to the presumption that Plaintiff was the individual who committed the crime with which he was charged; (6) Plaintiff had no Fourth or Fifth Amendment interest which was violated by having to turn over his watch without being read his *Miranda* warnings or having an attorney present; (7) probable cause existed to support Plaintiff's arrest; and (8) Defendants are entitled to qualified immunity.

### A. Plaintiff's Hearsay Objections

 The Court noted earlier that Plaintiff objected to a number of Defendants' undisputed facts, asserting that they constitute hearsay.[12] Hearsay is a statement "offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). Here, the statements that are alleged to be hearsay were not offered to prove the truth of the matter asserted as they would have been at a criminal trial. Rather, the statements were used to show

**12.** Unofficially, Plaintiff has objected to eighty-four paragraphs in whole or in part on this basis.

the effect that they had on Defendants in continuing their criminal investigation of Plaintiff. "Hearsay and other inadmissible evidence may be used in establishing probable cause, so long as the evidence bears strong indicia of reliability." *United States v. United States Currency Deposited in Account No. 1115000763247 For Active Trade Co.*, 176 F.3d 941, 944 (7th Cir.1999). In a summary judgment motion, a district court may consider statements that might otherwise be hearsay "strictly to determine the effect that they would have upon the arresting officers when communicated to them by a presumptively reliable citizen." *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir.2000). That is precisely the purpose for which the Court is considering the statements. The Court notes that many of these statements were made by B.F. Plaintiff may therefore argue that the statements do not bear a strong indicia of reliability or were not made by a presumptively reliable citizen. However, when considered in context with the other evidence in this case which does tend to establish probable cause, the Court finds that the statements do bear a strong indicia of reliability. Plaintiff's objections based on hearsay are therefore without merit.

### B. Plaintiff's Alleged Constitutional Violations

The Court will now note the constitutional violations which Plaintiff is alleging. Plaintiff is clearly asserting a violation of the Fourth Amendment for arrest without probable cause. Plaintiff is also apparently alleging that he was interrogated while in custody in violation of the Fifth Amendment. This is true despite the fact that no incriminating statements were subsequent-

ly used against him in a criminal proceeding. Plaintiff also contends that Defendants ignored exculpatory evidence and used leading and suggestive photo identifications to incriminate Plaintiff in violation of the Fourth Amendment.[13]

### C. Qualified Immunity

 In the interest of brevity, the Court will first consider Defendants' argument that they are entitled to qualified immunity. Government officials generally are shielded from liability for civil damages "insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Wollin v. Gondert*, 192 F.3d 616, 622 (7th Cir.1999). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). A two-part test is employed to determine whether qualified immunity applies: (1) whether the conduct alleged amounts to a federal constitutional or statutory violation; and (2) whether the constitutional standards were clearly established at the time of the incident. *See Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir.1999).

The rationale underlying qualified immunity is "[t]he necessity of protecting police officers from 'undue interference with their duties and from potentially disabling threats of liability.'" *Tangwall v. Stuckey*, 135 F.3d 510, 514 (7th Cir.1998), quoting *Harlow*, 457 U.S. at 806, 102 S.Ct. 2727. The doctrine of qualified immunity

---

**13.** Initially, the Court presumed that Plaintiff was asserting a Fourteenth Amendment violation. However, the parties' briefs treat these issues as going to whether or not there was probable cause to arrest Plaintiff and therefore as a Fourth Amendment issue. The Court will do likewise.

therefore serves to protect the workings of government by "avoid[ing] excessive disruption of government and permit[ting] the resolution of many insubstantial claims on summary judgment." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727.

Plaintiff's primary constitutional allegation is that he was arrested without probable cause in violation of the Fourth and Fourteenth Amendments. A law enforcement officer is shielded from § 1983 liability in the following circumstances:

> if *either* the federal law he is asserted to have breached was not clearly established at the time of the alleged violation or there exists no genuine dispute of material fact which would prevent a finding that his actions, with respect to following such clearly established law, were objectively reasonable.

*Tangwall,* 135 F.3d at 515 (emphasis in original). There is no question that the constitutional right to be free from arrest without probable cause was clearly established in 1997. *See Jenkins v. Keating,* 147 F.3d 577, 585 (7th Cir.1998) (noting that this right was clearly established by at least 1991). Thus, whether Defendants are entitled to qualified immunity depends on whether a reasonable officer, in light of the information of which he was aware at the time of the arrest, could have believed he had probable cause to arrest Plaintiff. *See id.*

### D. Probable Cause Test

 Probable cause to arrest exists if, at the time of the arrest, the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information were sufficient to warrant a reasonable belief that the suspect had committed a crime. *See Qian v. Kautz,* 168 F.3d 949, 953 (7th Cir.1999); *Mahoney v. Kesery,* 976 F.2d 1054, 1057 (7th Cir.1992); *Simkunas v. Tardi,* 930

F.2d 1287, 1291 (7th Cir.1991). The Seventh Circuit recently addressed the issue of probable cause in the context of a civil rights action for false arrest when the defendant raises the qualified immunity defense:

> With an unlawful arrest claim in a § 1983 action when a defense of qualified immunity has been raised, we will review to determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed. Courts have referred to the second inquiry as asking whether the officer had "arguable" probable cause. Arguable probable cause exists when "a reasonable police officer in the same circumstances and with the same knowledge ... as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law."

*Humphrey v. Staszak,* 148 F.3d 719, 725 (7th Cir.1998) (emphasis in original) (internal citations and quotations omitted). Thus, if probable cause is lacking with respect to an arrest despite an officer's subjective belief that he had probable cause, he is entitled to immunity as long as his subjective belief was objectively reasonable. *See Edwards v. Cabrera,* 58 F.3d 290, 293 (7th Cir.1995), citing *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Although the existence of probable cause is often a jury question, summary judgment is proper if there is no room for a difference of opinion about the facts or the reasonable inferences to be drawn from them. *See Qian,* 168 F.3d at 953.

Courts recognize that law enforcement officers are confronted with numerous scenarios on a daily basis and therefore evaluate probable cause "not on the facts as an omniscient observer would perceive them

but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer* seeing what he saw, hearing what he heard." *Mahoney,* 976 F.2d at 1057 (emphasis in original). Probable cause is therefore an objective test based upon "factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *See Wollin,* 192 F.3d at 623, quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Thus, as long as the officer's belief is reasonable, it need not be correct. *See Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

### E. Information Known To Defendants At Time Of Arrest

The Court will now assess the facts and circumstances which were within Defendants' knowledge to determine whether they were sufficient to warrant a reasonable belief that the suspect had committed a crime. First, the crime with which Plaintiff was charged was a violation of 720 ILCS 5/12–14.1(a)(1), Predatory Criminal Sexual Assault of a Child. That statute requires the State to prove that the accused was seventeen years of age or older and commits an act of sexual penetration with a victim who was under thirteen years of age when the act was committed. At the time of the alleged incident, it is undisputed that Plaintiff was over the age of seventeen and that B.F. was under the age of thirteen. It is also true that B.F.'s injuries were consistent with digital penetration. The question therefore becomes whether Defendants had probable cause to arrest Plaintiff for this offense.

■ In reviewing the evidence, it is clear that the facts and circumstances within Defendants' knowledge were sufficient to warrant a reasonable belief that Plaintiff had committed the crime with which he was charged. Initially, B.F.'s mother informed Defendants about the bloodstains found in his underwear. Although B.F. told several different stories about how the injury occurred, he eventually told his mother that someone named "Coach" had touched his bottom with his index finger. This information was relayed to Defendants by B.F.'s mother. Moreover, it was determined that B.F.'s injuries were consistent with sexual abuse. Defendants then interviewed B.F. The child indicated that Coach was the only adult who was interacting with the children outside. B.F. described how Coach spun Brett Hendricks and then himself. This was later corroborated by Brett Hendricks and several other witnesses. When the others had gone inside, B.F. stated that Coach digitally penetrated his rectum through his shorts and underwear six or seven times. B.F. would tell essentially the same account on subsequent occasions. He gave a description of Coach, noting that he wore a green and brown watch. Defendants eventually discovered that Plaintiff did in fact wear a green and brown watch.

Defendants also interviewed Plaintiff soon after the alleged incident. Defendants noted that Plaintiff appeared nervous when asked about the swings. Moreover, he indicated that he did not know who B.F. was. However, B.F.'s father stated that he and B.F.'s grandfather had gone over to the home of Mrs. Zoe Predmore soon after the incident. While there, Jon F. informed Plaintiff that his son had mentioned something about Coach. Plaintiff then became very defensive and nervous.

Defendants soon learned that the medical records from Dr. Raif's office and Blessing Hospital indicated trauma to the anal region consistent with digital penetration. Trooper Schwartz also learned

that Plaintiff's second polygraph indicated deception as to whether or not he assaulted B.F. Plaintiff objects to the use of polygraph evidence. However, as the Court earlier noted, polygraph results are one of many factors which may be used in determining whether, from an objective viewpoint, probable cause for an arrest exists under the Fourth Amendment. *See Booker v. Ward,* 94 F.3d 1052, 1058 (7th Cir.1996) (relying on polygraph results as one factor in the probable cause analysis).

### F. Arrest Of Plaintiff

It was at this point that Trooper Schwartz decided to seek an arrest warrant. On August 12, 1997, he met with State's Attorney Irving who assisted him in the preparation of a probable cause affidavit. Irving stated that he was of the opinion that the information known was sufficient to establish probable cause to arrest Plaintiff. The affidavit read as follows:

Victims [sic] mother, [A.F.] said that on 7/12/97 that her, her boyfriend, and her 7 yr old son (B.F. DOB 02/10/90) attended a retirement party in Griggsville, IL at the American Legion.

[F.] told me that on the following morning (07/13/97) B.F. was not acting like himself and was very "clingy" towards her. [F.] said that at this time she observed a blood stain in B.F. underware [sic]. After further examination [F.] decided to have B.F. examined by a doctor. Doctors reports indicate trauma to the anus of B.F. which resulted in the blood stained underware [sic].

B.F. said that while he was playing at the park "Coach," later identified as Gregory K. Predmore (07/26/62), inserted his finger into his butt (through the clothing) 6 or seven times. B.F. said that he told Predmore to stop after the first time. B.F. was able to pick Pred-

more out of a photo lineup. The park where this occurred is the Griggsville City Park next to the American Legion.

The probable cause affidavit was signed by Trooper Schwartz. Judge David Slocum determined that there was probable cause to arrest Plaintiff and therefore signed the arrest warrant.

Plaintiff contends that Defendants should not be shielded by the warrant because they were not completely forthcoming with the judge. Plaintiff notes that Defendants failed to include in the affidavit that B.F. initially denied that anything happened to him and then gave different explanations as to the source of his injury. However, the Court notes that the type of incident allegedly suffered by B.F. would in all likelihood be very difficult for a seven-year old to discuss. Moreover, Dr. Raif determined that B.F.'s injury was consistent with sexual abuse. Thus, the fact that B.F. did give different explanations as to the source of his injury did not necessarily mean that Defendants should have ended their criminal investigation of Plaintiff.

Plaintiff also emphasizes the unreasonable and suggestive nature of the photo lineup. However, even assuming this to be true about the photo lineup, Plaintiff overstates its significance. It is undisputed that Plaintiff was the only adult interacting with the children on the date in question. Moreover, with the exception of his brother, Plaintiff was the only adult male who was outside around the time of the alleged incident. It is also undisputed that Plaintiff's brother was preoccupied with his baby daughter while he was outside before the incident was alleged to have occurred. Additionally, members of Plaintiff's family and others identified him as "Coach." Thus, the issue was not really who committed this crime but rather whether there was probable cause to be-

lieve that Plaintiff had committed the crime for which he was arrested. More specifically, the issue was whether the facts and circumstances within Defendants' knowledge were sufficient to warrant a reasonable belief that Plaintiff committed the crime of Predatory Criminal Sexual Assault.

■ The determination of whether or not there is probable cause turns on the information known to the officers at the time of the arrest, not on information that is subsequently received. *See Hebron v. Touhy,* 18 F.3d 421, 423 (7th Cir.1994). Thus, "[s]o long as a reasonably credible witness or victim informs the police that someone has committed ... a crime, the officers have probable cause to place the alleged culprit under arrest, and their actions will be cloaked with qualified immunity if the arrestee is later found innocent." *Jenkins,* 147 F.3d at 585. Thus, the Court's inquiry as to whether there was probable cause to arrest Plaintiff is restricted to the information that was available to Defendants on or before August 12, 1997. Here, there was more evidence than an alleged victim informing Defendants that Plaintiff committed a crime. There were the bloodstains in B.F.'s underwear. There was also the medical evidence which indicated that B.F.'s injuries were consistent with sexual abuse. Moreover, there was evidence that Plaintiff was the only adult interacting with the kids and that he spun B.F. and Brett Hendricks on his shoulders. Significantly, Brett Hendricks indicated that as he was walking toward the legion building, he turned around and saw Plaintiff spinning B.F. on his shoulders. This bolsters B.F.'s own account that he and Plaintiff would eventually be alone after everyone else had gone inside. Additionally, despite Plaintiff's assertion that no one referred to him as "Coach" on that date, his own family noted that he was Coach. It was also clear that Plaintiff wore a green and brown watch as was described by B.F. Defendants also observed Plaintiff's nervousness when being interviewed about the swings. Moreover, the second polygraph test indicated deception on the part of Plaintiff as to whether or not he had assaulted the minor. Thus, on the date of Plaintiff's arrest, Defendants were aware of much more than the mere allegations of the alleged victim that tended to establish probable cause that Plaintiff had committed the crime with which he was charged. The Court is therefore of the opinion that a reasonable police officer would be of the belief that Plaintiff's arrest was lawful.

The Court also notes that an arrest warrant was issued by a "detached and neutral magistrate." The Seventh Circuit has explained that "[t]he Supreme Court ... lent support to the notion that qualified immunity under section 1983 may be equated with the good-faith exception to the exclusionary rule in the context of arrest and search warrants." *Olson v. Tyler,* 825 F.2d 1116, 1120 (7th Cir.1987), citing *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

> In [*United States v.*] *Leon,* [468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ], we stated that our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.... [T]he rule we adopt in no way requires the police officer to assume a role even more skilled ... than the magistrate. It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination ... and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a

magistrate, the officer who requested the warrant cannot be held liable [under § 1983].

*Malley*, 475 U.S. at 345–346, 106 S.Ct. 1092 (internal citations and quotations omitted). There are no allegations that the warrant was defective. Plaintiff merely alleges that probable cause was not present. The Court disagrees. Thus, Defendants' reliance on a judicial official for a probable cause determination is further evidence that at the very least, a reasonable officer could have mistakenly concluded that probable cause to arrest Plaintiff existed.

### G. Post–Arrest Investigation

█ Once probable cause has been established, police officers have "no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995) (internal quotations omitted). Nevertheless, following Plaintiff's arrest on August 12, 1997, Defendants continued their criminal investigation. B.F.'s grandmother described B.F.'s strange behavior upon coming inside after the incident was alleged to have taken place and recalled B.F.'s account of the incident which was consistent with what he had earlier told Defendants. Moreover, B.F.'s stepfather also indicated that B.F. acted strangely upon returning inside. B.F. was also interviewed by Trooper Schwartz one week after Plaintiff was arrested and once again stated that Coach was the one who digitally penetrated his anus. Moreover, Plaintiff's friend Thomas Wainman noted that Plaintiff was not acting like he normally did at approximately 8:00 p.m. on July 12, 1997. B.F.'s grandfather also noted that B.F. acted strangely upon coming inside the legion hall. Moreover, Mr. Whitlock stated that when B.F.'s father confronted Plaintiff, he became defensive.

Several months after the alleged incident, B.F. was again reinterviewed by Trooper Schwartz and State's Attorney Irving. On this occasion, he indicated that he had been touched in the front. B.F. informed the two that he had told the truth before and did not want to discuss it. Social worker Tamie Pool was also interviewed by Defendants. She noted that approximately six weeks after the alleged incident, B.F. told her essentially the same account of Coach spinning him and then digitally penetrating his anus.

The medical records also corroborated the child's story of a sexual assault. Dr. Mark Schaadt determined that B.F.'s injuries were consistent with sexual assault to the anus and anus manipulation and consistent with a finger being inserted into the anus through the underwear and shorts. Moreover, Dr. Schaadt said that the chance of such an injury being caused by a fall from monkey bars or a bicycle was extremely remote. Dr. Raif also determined that B.F.'s injuries were consistent with allegations that his rectum was penetrated with a finger through the underwear and shorts. Moreover, she stated that she was almost positive that B.F. had been sexually assaulted. She also told Trooper Schwartz that the injuries could not have been caused by a fall from a bicycle.

Thus, this was not a case of the probable cause dissipating after the arrest of Plaintiff. Rather, the facts and circumstances that were uncovered after his arrest supported Defendants' initial belief that the suspect committed the crime with which he was charged.

On September 9, 1998, Judge Richard Greenlief ruled that the statements made by B.F. to others were inadmissible. B.F. was unavailable to testify. The parties' submissions do not indicate whether it was

then that the criminal charges against Plaintiff were dismissed. However, because much of the evidence against Plaintiff consisted of statements that the child made to others, the Court assumes this to be the case.

Plaintiff seems to suggest that because much of the evidence was suppressed in the criminal proceeding, Defendants therefore lacked probable cause to arrest him. This ignores the fact that even if the Court did not consider the statements of the child, there is ample evidence that would warrant an officer having at the very least arguable probable cause that Plaintiff had committed the crime with which he was charged. This includes the medical evidence, the demeanor of B.F. and Plaintiff following the alleged incident, the evidence that the two of them were alone for a period before coming inside and other evidence. Of course, in determining whether there was probable cause, this Court did consider much of the evidence that was barred in the criminal proceeding because of the prohibition against hearsay. That evidence was considered for the purpose of determining the effect it had on Defendants in assessing whether there was probable cause. In any event, we do not ask our police officers to make evidentiary rulings during the course of an investigation.

### H. Plaintiff's Critiques Of The Criminal Investigation

Plaintiff attempts to create a material issue by advancing the opinions of Robert Lucas, an expert witness in the area of police/investigative procedure and interviewing and interrogation. The Court is not persuaded. Undoubtedly, there are things that could have been done differently in this investigation. This is probably the case in any extensive criminal investigation. However, it is ludicrous to suggest that a few general criticisms of a police investigation can create a genuine issue of material fact as to whether there was probable cause to make an arrest. The Court is unaware of any constitutional right to a perfect police investigation.

As for some of Mr. Lucas' specific allegations, perhaps notes should have been preserved of Defendants' meetings with B.F. However, the accounts that B.F. gave to others of the alleged incident were fairly consistent with Defendants' interviews with the child. The Court is therefore convinced that Defendants' reports of the interviews are reliable. Mr. Lucas also questions why B.F. was interviewed in the presence of family members. The Court notes that the subject matter of his discussion with the officers was of a highly sensitive nature. It may have been of some comfort for a seven-year old to have his mother or another family member present when discussing the alleged incident with two strangers. Mr. Lucas also opined that it was possible that B.F. was merely telling Defendants what they wanted to hear so that they would go away. However, it would appear that this is always a risk in an investigation of sexual abuse. The Court does not believe that this is a sufficient reason for police officers to discontinue investigating allegations of such a nature. As for Mr. Lucas' more general criticisms, the Court is not persuaded.

Plaintiff also proffers the opinions of Dr. Georgia Davis, a trained psychiatrist, in attempting to defeat summary judgment. She also questions whether a rapport was established between Defendants and B.F. and contends that the officer appeared to set the pace for the interview, noting that the initial questioning was too intense and premature. This may or may not be the case. However, it is hardly sufficient to create a material issue as to whether probable cause was present. Dr. Davis also

questions the fact that the records involve only summaries of the interview. The Court is not persuaded for the same reasons that it earlier noted when addressing Mr. Lucas' similar criticism. Dr. Davis also criticizes the fact that so many leading questions were used by Defendants in questioning B.F. The Court notes, however, that Defendants were dealing with a young child. Moreover, the Seventh Circuit has recognized that when dealing with infant and children witnesses, "procedural requirements such as absence of leading questions—may 'in many instances be inappropriate or unnecessary to a determination whether a given statement is sufficiently trustworthy.'" *Doe v. United States,* 976 F.2d 1071, 1080 (7th Cir.1992), *cert. denied,* 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993), quoting *Idaho v. Wright,* 497 U.S. 805, 818, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). The Court finds that this is such an instance. Dr. Davis also asserts that tapes should have been used in interviewing the child. While this may be the case, the Court reiterates that B.F. told essentially the same story to different people on numerous occasions. The Court finds that Defendants' reports of the interviews are therefore reliable. Dr. Davis also contends that the officers should have followed up on B.F.'s description of Coach. Again, the Court is not really concerned with whether the child described Plaintiff's shorts as white or khaki or accurately described the stripes or lack thereof on Plaintiff's shirt. Plaintiff's family indicated that he was Coach. Moreover, Plaintiff and others indicated that he was the only adult interacting with children. The question was not who allegedly committed this act but whether the facts and circumstances within the officers' knowledge were sufficient to warrant a reasonable belief that Plaintiff had committed the crime with which he was charged. The possibility that a seven-year old child's description of Plaintiff was not entirely accurate does not negate the other facts and circumstances of which Defendants were aware that tended to show probable cause. The Court is therefore not persuaded by Dr. Davis' criticisms of the investigation.

## I. Recap

The Court therefore finds that the facts and circumstances within Defendants' knowledge were sufficient to warrant a reasonable belief that Plaintiff committed the crime with which he was charged. Accordingly, as was determined by Judge Slocum and Judge Greenlief, Defendants had probable cause to arrest Plaintiff for the crime with which he was charged. Because there exists no genuine dispute of material fact as to whether Defendants' actions were objectively reasonable with respect to what they knew, they are entitled to qualified immunity from § 1983 liability.

Before proceeding any further, the Court notes that Plaintiff objected to Defendants' statement that they were unaware of any evidence which would have tended to establish the falsity of the allegations against Plaintiff and that they withheld such evidence. However, Plaintiff failed to provide any basis in the record that would establish that Defendants were aware of any evidence that would have established the falsity of the allegations. Specifically, the Court does not agree that any minor inconsistency between the clothing that the videotape depicts Plaintiff as wearing and what he was described to have worn at the retirement party establishes the falsity of the allegations against Plaintiff. Moreover, a couple of frames of the videotape depicting B.F. in a playful mood upon returning inside does not establish the falsity of the allegations against Plaintiff. Plaintiff also notes that Defendants were aware that Plaintiff had an injury on the finger that he was accused of using to assault the minor

which is directly inconsistent with the allegations made against him. The Court is not persuaded that this tends to establish the falsity of the allegations against Plaintiff. Plaintiff fails to cite any portion of the record for this proposition. Accordingly, there is no medical testimony which indicates that Plaintiff would have been incapable of digitally penetrating the child's anus. Plaintiff also notes that Defendants failed to investigate the opportunity for a sexual assault when B.F. was alone before the party with Jon F., his father. As the Court earlier noted, the record indicates that the child was alone with Scott Andress before the party. Presumably, Plaintiff is referring to Defendants' failure to investigate a sexual assault occurring at this time. However, the Court is not of the opinion that this establishes the falsity of the allegations against Plaintiff. Defendants' failure to investigate such an assault occurring at that time likely can be explained by the fact that no evidence suggested that it occurred then. Finally, Plaintiff asserts that a child unknown to him went to the bathroom at the time of the alleged incident in the park. Because the precise moment that the alleged incident took place is not known, the Court is unaware as to how this can establish the falsity of the allegations against Plaintiff.

It is clear that Defendants had probable cause, or at least arguable probable cause, to arrest Plaintiff. There is no genuine dispute of material fact that a reasonable officer, in light of the information of which he was aware at the time of the arrest, could have believed he had probable cause to arrest Plaintiff. Accordingly, Defendants are entitled to qualified immunity from § 1983 liability.

### J. Plaintiff's Other Alleged Constitutional Violations

Plaintiff also alleges a Fifth Amendment violation in that he was questioned without having been read his *Miranda* warnings and without the benefit of an attorney. The parties dispute whether this questioning amounted to custodial interrogation. However, it is undisputed that no statements were ever used against Plaintiff because of the charges being dropped. Plaintiff has failed to cite any case which indicates that he would have any remedy for this alleged constitutional violation other than the suppression of evidence. Thus, because the law is not clearly established that Plaintiff may recover damages in a § 1983 action for not being read his *Miranda* warnings, Defendants are entitled to qualified immunity.

### K. Plaintiff's State Law Claim

Plaintiff has also asserted the State law claim of malicious prosecution. In order to maintain such a claim, Plaintiff must show that: "(1) he was subject to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Sneed v. Rybicki*, 146 F.3d 478, 480–481 (7th Cir.1998) (internal citations omitted). The Court has already determined that there exists no genuine dispute of material fact that Defendants had probable cause to arrest Plaintiff. Accordingly, Plaintiff cannot maintain the malicious prosecution claim. Defendants are therefore entitled to summary judgment on Plaintiff's state law claim as well.

*Ergo*, Defendants' motion for summary judgment is ALLOWED. This cause is DISMISSED WITH PREJUDICE.