Xing QIAN, Plaintiff–Appellant,

v.

James R. KAUTZ, as the Chief of Police of the Long Beach Police Department, et al., Defendants–Appellees.

No. 97–3295.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1998.

Decided Feb. 16, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied March 16, 1999.

Daniel H. Pfeifer, Jeffrey J. Stesiak (argued), Jon A. Criss, Sweeney, Pfeifer & Blackburn, South Bend, IN, for Xing Qian.

Jeffrey L. Thorne, Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos, Michigan City, IN; William W. Kurnik (argued), Kurnik, Cipolla & Barasha, Arlington Heights, IL, for James R. Kautz, Long Beach Police Dept., Town of Long Beach, Todd A. Bullis, and other unknown Defendant Police Officers.

Martin W. Kus (argued), Newby, Lewis, Kaminiski & Jones, LaPorte, IN, for Bob Blair.

Before FLAUM, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

When the events leading to this lawsuit began to unfold, ambiguous behavior combined with a severe language barrier led to the arrest of Xing Qian. At a critical point, however, the police concluded that Qian (whose lawyer identifies this as his surname) could be released. Because he did not want to pay for a hotel room, they then re-arrested him, consigned him to the drunk tank, and failed to recognize that he was suffering from a serious medical condition. This case is the ultimate consequence of those events. The district court granted summary judgment for the defendants on all counts, but we have concluded that there are significant disputed issues of fact that require further proceedings and we therefore remand for that purpose.

I

Qian immigrated to the United States from China in 1986, settling initially in Mundelein, Illinois. In April 1993, he was involved in a car accident that left him subject to recurring headaches and dizziness. Soon thereafter, he moved to Ohio to take a job in a friend's restaurant. The headaches persisted, however, so Qian decided to return to Illinois to see the doctor who had treated him after the accident. A few days before the

July 4th holiday in 1993, Qian was driving to Illinois from his Ohio home to revisit his doctor. Tired and dizzy while he was driving, he became lost in Long Beach, Indiana. He wound up in a residential area, where he lost control of his car, struck a wooden planter, drove up the curb, crossed several lawns and driveways, and eventually stopped in the bushes some 100 feet later. Qian himself then asked one of the neighbors to call the police.

When police officer Todd Bullis arrived, shortly after 3:00 p.m., he observed that Qian was walking around slightly slumped, unkempt, and unsteady. Bullis thought Qian's speech was odd, perhaps because it was slurred, or perhaps because of his heavy Chinese accent.[1] Bullis inspected the car, which showed no signs on the inside of a violent impact and did not contain any alcohol or other drugs. He also inspected Qian and smelled no alcohol on him. Nonetheless, Bullis decided to arrest Qian on suspicion of operating a vehicle while intoxicated.

At the Long Beach police headquarters, Qian had to be helped out of the car. Police Chief James Kautz thought that Qian was unstable on his feet and was speaking with slurred speech. Both Kautz and Bullis asked Qian a few times whether he was all right, and Qian replied in the affirmative. Qian consented to a breathalyzer test and twice blew a 0.0% result. Nevertheless, Bullis thought drug use was still a possibility, and so he took Qian to the local hospital for blood and urine tests. Hospital personnel performed those tests and also examined Qian. At the same time, Bullis discovered that Qian had about $1000 in cash with him, which he counted in the presence of a hospital security guard and returned to Qian. Bullis and Qian then returned to the police station to await the test results. Soon thereafter, the hospital called with the results of the "Stat 9," a urine test that can detect the presence of nine high-profile drugs. The results were negative. Only the blood test results remained to be reported.

Bullis then tried calling some of the telephone numbers he found in Qian's wallet, but he could not find anyone to whom Qian could be released. He also unsuccessfully tried to contact the local prosecutor. An investigator at that office suggested that the police might take Qian to a local hotel and seek an arrest warrant later if the blood tests came back positive. Bullis thought this a sensible course of action, and with Kautz's approval, he drove Qian to a local Red Roof Inn. Here the facts are confused, but according to Qian, he did not understand what was going on and did not want to use his money to pay for a hotel room. Bullis later testified at his deposition that he intended to leave Qian on his own at the hotel and that if Qian had rented a room he would no longer have been detained. Instead, however, when Qian refused to book the room, Bullis decided to take him back into custody and charge him with Operating While Intoxicated (OWI), despite the fact that all evidence collected to that point indicated that whatever else Qian had done, it was not that. Bullis then took Qian to the LaPorte County jail and turned him over to the custody of Sheriff Bob Blair. He informed the jailers of everything that had transpired to that point, and one of the jailers tried to interview Qian for booking. Unfortunately, the departmental translator spoke the wrong Chinese dialect, and so this effort yielded little information. The jail personnel had differing reactions to Qian's condition: one thought he was exhibiting signs of alcohol or drug intoxication, and another did not see it that way. The latter officer asked Qian if he was suffering from withdrawal, and he replied no. While Qian was being booked, one of the prisoners at the jail told the officers that he thought Qian was a Michigan City heroin dealer, which led the officers to place a "hold" on Qian and his money pending a drug dog sniff of his car.

The next day, Qian stayed in the jail. He was still very unsteady. Deputies checked his arms for needle marks and found none. Again, he denied that he was suffering from any form of withdrawal. At 5:00 p.m. that day, Bullis informed the jail to cancel the "hold" because the drug dog had not alerted on Qian's car. At that point, everyone was

---

1. We say "Chinese" here because the record does not indicate whether Qian was a Mandarin speaker or a speaker of another dialect in the Chinese family of languages.

still waiting for the last blood test results. On July 4, little happened. On Sunday morning, July 5, the sheriff's deputy who delivered Qian's breakfast found him lying in a fetal position near the cell door. She told him it was time to eat, but he did not get up. She returned at 11:15 a.m. to give him his lunch and found his breakfast untouched and his position unchanged. Two deputies came to move him and noticed that he had urinated on himself. His pulse and blood pressure were both normal, but they paged the jail physician for advice.

When the doctor responded, around 12:20 p.m., they described Qian's symptoms. Like everyone else thus far, the doctor thought that Qian might be under the influence of drugs (even though he had been in custody for three days and all tests were negative). He advised the deputies to get Qian up, walk him around, and give him fluids. They tried to do this, but Qian could not walk on his own. Around 1:30 p.m., the hospital called and confirmed that the last drug test was also negative. At last, around 2:45 p.m., one of the officers present at Qian's initial booking (Corporal Williams) returned and was told about Qian's condition. Williams ordered Qian to be transported immediately to the hospital. Forty-five minutes later he arrived. A CAT scan revealed that he was suffering from a subdural hematoma. That evening, he underwent an emergency craniotomy. Six days later, he was discharged from the hospital.

Qian subsequently brought an action for damages under 42 U.S.C. § 1983 against Bullis, Kautz, and the Long Beach Police Department (the "Long Beach defendants") alleging, among other claims, that they violated his Fourth Amendment rights by arresting him without probable cause. He also sued LaPorte County, the LaPorte County Sheriff's Department, and several individual officers employed by the Sheriff's Department (the "LaPorte County defendants"), claiming that they had violated his Fourteenth Amendment due process rights by wrongfully denying him adequate medical treatment. As we noted before, the district court granted summary judgment in favor of the defendants.

## II

### A. *Legality of Initial Arrest*

The first question we consider is whether the district court correctly determined that Bullis had probable cause to believe that Qian was guilty of operating a vehicle while intoxicated in violation of Indiana law. The answer to this question resolves Qian's § 1983 claim that his initial arrest was unlawful, both on the merits and for purposes of the officer's claim to qualified immunity. See *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir.1997); *Boyce v. Fernandes*, 77 F.3d 946, 948 (7th Cir.1996).

While the existence of probable cause is often a jury question, summary judgment is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 473 (7th Cir.1997); *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1243 (7th Cir.1994). As always, we review a district court's grant of summary judgment in such cases *de novo*, viewing the record and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Sheik–Abdi*, 37 F.3d at 1243. We will affirm only if we find no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

A police officer has probable cause to arrest when, at the moment the decision is made, the facts and circumstances within her knowledge and of which she has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense. *United States v. Seifullah Muhammad*, 120 F.3d 688, 696 (7th Cir.1997), citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). This flexible, common-sense approach does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable. *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Moreover, this is an *ex ante* test: the fact that the officer later discovers additional evidence unknown to her at the time of the arrest is irrelevant

to whether probable cause existed at the crucial time. *Hirsch v. Burke,* 40 F.3d 900, 904 (7th Cir.1994); *Maltby v. Winston,* 36 F.3d 548, 557 (7th Cir.1994).

We agree with the district court that the undisputed facts show that Bullis had probable cause to believe Qian had been operating his vehicle while intoxicated. Bullis had observed that Qian had lost control of his car and crashed, that he was hunched over and having difficulty walking, that the inside of his car showed no signs that his body had hit anything during the accident, that he denied being injured and showed no physical signs of injury, and that his speech seemed slurred. Furthermore, Bullis did not know anything about Qian's prior car accident and resulting head injury. Relying on his experience, Bullis reasonably surmised that Qian's behavior most likely resulted from intoxication.

■ Qian offers a somewhat novel legal theory to overcome this reasoning. In his view, Bullis' observations were insufficient as a matter of law to support a reasonable belief of intoxication because they included only "general indicators" of intoxication (*e.g.*, slurred speech, unsteadiness, etc.) and no "specific indicators" of intoxication (*e.g.*, smell of alcohol, bloodshot eyes, failed sobriety tests, etc.). As he explains the distinction, general indicators merely help an officer to determine if a person has an impairment or a loss of facilities, while specific indicators are specifically alcohol or drug related. According to Qian's theory, a police officer must observe a specific indicator before he may arrest a suspect for operating a vehicle while intoxicated and Bullis' general observations did not meet this standard.

Qian cites no case law supporting such a distinction between general and specific indicators of intoxication. Whatever Indiana law may say about this (and it does not appear currently to embrace this theory), we conclude that there is nothing so exacting in the Fourth Amendment's requirements for the reasonableness of arrests. Instead, it is well established that the totality of the circumstances establishes reasonableness or lack thereof. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Unit-*

*ed States v. Rucker,* 138 F.3d 697, 700 (7th Cir.1998). In another situation, it is possible that the absence of the usual evidence of intoxication might be sufficient to defeat a finding of probable cause. In our case, however, the overall setting easily supports Bullis' decision to arrest Qian on the scene.

## B. *Legality of Re–Arrest at the Red Roof Inn*

■ The most important question we face at this point is whether the record unequivocally shows that Qian was subjected to one continuous exercise of custody, from the time of his initial arrest through his delivery to the hospital for the emergency surgery, or if a reasonable jury could find that he was released from custody at the Red Roof Inn and then re-arrested. Qian, of course, takes the latter view of events, while the Long Beach defendants argue that the events surrounding Qian's detention must be viewed as one continuous exercise of control.

■ Whether a person is in custody for the purposes of the Fourth Amendment is determined under an objective standard in light of the totality of the circumstances, with the ultimate inquiry being whether there is a formal arrest or a restraint on the suspect's freedom of movement of the degree associated with a formal arrest. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (*per curiam*); *United States v. James,* 113 F.3d 721, 727 (7th Cir. 1997); *Sprosty v. Buchler,* 79 F.3d 635, 640 (7th Cir.1996). The test is how a reasonable person in the suspect's position would have understood the situation. *Sprosty,* 79 F.3d at 642. If a reasonable person in Qian's position would have believed that he was free to leave once he and Bullis arrived at the hotel, then Qian was no longer under arrest.

On this record, a jury could find that a reasonable person in Qian's position would have understood that once Bullis had dropped him off, he was free to come and go from the hotel as he pleased. At his deposition, Bullis expressly admitted that if Qian had checked into the hotel, he would no longer have been detained. When they arrived at the hotel, Bullis immediately re-

moved Qian's handcuffs and went about securing Qian a room. There was no indication that Bullis intended to stay at the hotel with Qian or otherwise keep watch to make sure that he stayed there through the night. As soon as Bullis pulled out of the hotel parking lot, Qian could have checked out and been on his way, without the officer's permission or knowledge. Not surprisingly, the Long Beach defendants interpret the course of events at the hotel differently. Nonetheless, at trial they will have an opportunity to convince a jury of their version of events. At this stage, there is a disputed issue of material fact making summary judgment inappropriate.

 Taking the facts at this point most favorably to Qian, there was a second arrest at the Red Roof Inn. Even so, the defendants would still prevail if probable cause existed to support that arrest, but we cannot say as a matter of law that it did. In contrast to the situation prevailing at the time of the initial arrest, by the time Bullis arrested Qian at the Red Roof Inn, he knew that Qian had twice blown a 0.0% alcohol reading on the breathalyzer and that a hospital urinalysis had turned up negative both for alcohol and for nine "high-profile" drugs. Nor had the officers' searching of Qian's car turned up any evidence pointing to either alcohol or drug intoxication. As a result, we cannot find as a matter of law that a reasonable person in Bullis' position could have believed that Qian was intoxicated.

 Turning to an entirely different theory to justify the second arrest (and ignoring the fact that it was specifically listed as an arrest for OWI), the Long Beach defendants also argue that, even if Qian was temporarily released at the hotel, Bullis was justified in taking him into "protective custody" for his own safety and therefore probable cause was not required. It is true that Indiana law permits a police officer to take into custody someone who appears to be mentally ill and who may present a danger to himself or others. See *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 400 (7th Cir.1993). However, the state has also established a detailed statutory scheme for such involuntary incarcerations, including re-quirements that the police officer seek a medical assessment of the detainee's condition and that the incarceration be approved by a judge. See IND.CODE §§ 16–14–9.1–3, 16–14–9.1–6.5, 16–14–9.1–7. Even if Bullis might have been justified in taking Qian into protective custody, it is clear that is not what occurred here. He followed none of the statutorily required procedures for protective custody, and instead of taking Qian to a hospital or other facility where his mental and physical condition could be monitored, Bullis delivered Qian to the "drunk tank" of the local jail. At no point over the course of Bullis' investigation and the subsequent detention was Qian treated as anything other than a criminal suspect. Again, given the present state of the record, the Long Beach defendants' protective custody argument is not enough to warrant summary judgment in their favor.

### III

 We next consider Qian's claim against the LaPorte County defendants for their alleged denial of adequate medical attention in violation of the Due Process Clause of the Fourteenth Amendment. A state official violates the due process rights of a pretrial detainee when she acts with deliberate indifference toward the detainee's serious medical needs. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir.1995); *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir.1991); *Salazar v. City of Chicago*, 940 F.2d 233, 239 (7th Cir.1991). This court has observed that "deliberate indifference" is simply a synonym for intentional or reckless conduct, and that "reckless" describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred. *Brownell*, 950 F.2d at 1290. In this sense, the due process standard is analogous to that utilized in the Eighth Amendment context, where prison officials may be found liable for disregarding a substantial risk to an inmate's health or safety. See *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In both cases, the relevant inquiry is whether the official actually knew about the plaintiff's condition, not whether a reasonable official should have known. Compare *Brownell*, 950

F.2d at 1291 (applying a subjective standard in the Fourteenth Amendment context) with *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970 (applying a subjective standard in the Eighth Amendment context).

The district court granted summary judgment in favor of the LaPorte County defendants based on its determination that the record at most could only support the inference that the LaPorte County officials should have known about Qian's medical condition, but in no case that they actually did know. Unfortunate as this was for Qian, we agree. Although it may be objectively unreasonable to believe that an individual would continue to exhibit signs of intoxication after 72 hours in police custody, there is nothing in the record to suggest that the defendants' belief that this was the case was not honestly held. Qian has fallen into the very trap that we warned of in *Steele v. Choi*, 82 F.3d 175 (7th Cir.1996): He accuses his jailers of having acted unreasonably with regard to his medical condition without presenting any evidence that they acted deliberately. Because the Fourteenth Amendment prohibits only deliberate indifference to a detainee's medical condition, and not mere unreasonable failures to act, Qian's due process claim fails as a matter of law.

Before concluding, we wish to add a word about the proceedings on remand. Our decision here preserves one of Qian's claims for wrongful arrest, which we conclude should not have been dismissed on summary judgment. At this stage, the record does not permit us to speculate about the damages Qian may have suffered from this aspect of the police conduct. Perhaps he suffered no damage at all, if by intervening when they did the police (albeit in ways not authorized by Indiana law) saved his life. On the other hand, Qian might be able to show that this is not the case, or he might wish to argue for at least nominal damages. This is not the time and place to resolve such matters; we merely flag the point for the parties' and the court's consideration on remand.

Accordingly, we AFFIRM the district court's grant of summary judgment in favor of the LaPorte County defendants. We REVERSE the grant of summary judgment in favor of the Long Beach defendants and REMAND for further proceedings.