[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 31, 2004
THOMAS  K. KAHN
CLERK

_____

No.  03-13331

_____

D. C. Docket No. 99-03393-CV-AJ

MISTY KINGSLAND,

Plaintiff-Appellant,

versus

CITY OF MIAMI,
a Florida Municipal Corporation,
RAMON DE ARMAS,
individually,
E. VALENZUELA,
individually,
J. BALIKES,
individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 31, 2004)**

Before WILSON and KRAVITCH, Circuit Judges, and GOLDBERG[*], Judge.

WILSON, Circuit Judge:

We vacate and withdraw our previous opinion dated May 11, 2004, 369 F.3d 1210 (11th Cir. 2004), and substitute the following opinion.

Appellant Misty Kingsland appeals the district court's grant of summary judgment in favor of Defendants-Appellees, based on her § 1983 claims of false arrest and malicious prosecution.[1] For the reasons that follow, we reverse the district court's judgment and remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

*A. Factual Background*

At approximately 8:00 p.m. on November 27, 1995, Appellant Kingsland was involved in an automobile accident with off-duty Officer Ramon De Armas of the City of Miami Police Department. Officer De Armas reported the accident on his police radio. Kingsland, who was driving a yellow Penske rental truck, had two passengers with her. De Armas was transporting one passenger in his

---

[*] Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

[1] Kingsland does not appeal summary judgment as to her claims against the City of Miami, but only as to her claims against the defendant officers.

unmarked police vehicle.  Kingsland asserts that De Armas ran a red light and caused the accident, while De Armas avers that it was Kingsland who ran the red light.

At the time of the accident, Kingsland was not under the influence of alcohol or drugs.  As a result of the accident, Kingsland suffered head trauma, cried, experienced dizziness, felt sick, and had blurred vision.  Following the collision, she climbed out of the rental truck and sat down in a pile of shattered glass adjacent to the truck, cutting her hand.  She was disoriented and was "in and out of it."  Not knowing Officer De Armas had been a participant in the collision, and instead believing him to be an officer who had responded to the scene, Kingsland screamed to him, "He just ran the red light and hit me!"

Although Miami police officers promptly responded to the scene of the accident, an officer did not approach Kingsland until approximately thirty minutes had passed.  At that time, Kingsland remained seated in a pile of shattered glass and was unable to stand up.  When asked for her license and registration, she attempted to stand to retrieve it, but had to sit back down.  One of her passengers eventually obtained the license and registration from the truck.

Kingsland alleges that she told the officers that she was dizzy and could not stand up.  She also mentioned that she had sustained injuries to her head, and

3

requested ice for her head, which she did not receive.[2] Contrary to the assertions of the defendants, Kingsland contends that she was not treated at the scene by emergency medical technicians. Officer De Armas and his passenger, however, did receive medical treatment.

Despite the presence of about twenty police officers at the scene, no officer asked Kingsland for a statement of her version of the events or spoke to any witnesses on the scene. However, the officers spent a great deal of time talking to Officer De Armas, who claimed that Kingsland was at fault.

When Officer Valenzuela arrived at the scene, Officer Balikes told Officer Valenzuela that he noticed an odor of cannabis coming from Kingsland's vehicle and person, and that he thought Kingsland was impaired. Officer Valenzuela then went to the truck to corroborate Officer Balikes's statements, and later testified that he also smelled a "slight odor" of cannabis on Kingsland's person. Yet, none of these investigating officers saw fit to conduct a search of Kingsland's vehicle. Likewise, no drug-sniffing dogs were summoned to corroborate the officers' beliefs, and no cannabis was ever found. Kingsland denies the existence of any

---

[2] A post-accident physical exam conducted by Kingsland's doctor revealed that Kingsland bore two black eyes; a bruise and a large bump on her head; bruising from her left shoulder across her chest (presumably from her seatbelt); and injuries to her left jaw, hip, and shoulder due to impact with the inside of the truck.

cannabis or cannabis odor on her person or in the truck. In her complaint, she alleges that the officers fabricated the smell of cannabis in an effort to manufacture probable cause.

Officer Valenzuela also noticed that Kingsland's eyes were bloodshot. Kingsland explains that if her eyes were bloodshot, it was because she had been crying. Officer Valenzuela saw one of Kingsland's passengers being treated by rescue personnel, but did not attempt to talk to him or the other passenger to assess whether either of them smelled of cannabis.

Officer Balikes and another officer asked Officer Valenzuela, who is a certified Driving Under the Influence (DUI) technician with two years experience, to administer a field sobriety test on Kingsland. Kingsland informed the officers that she was feeling dizzy and sick, and that she wanted to go to the hospital.[3] The officers did not talk to rescue personnel about Kingsland's condition.

During the "walk and turn" test, Kingsland did an about face instead of doing the turn as instructed. She also swayed while balancing on one leg, did not properly place her finger to her nose, missed the tip of her nose five times, failed to follow instructions, had eyelid tremors, and failed to keep her eyes shut during

---

[3] In contrast, Officer Valenzuela testified that Kingsland did not say she was dizzy, and that she responded that she was fine when asked if she was okay.

the Rhomberg balancing test. Officer Valenzuela concluded that Kingsland failed the sobriety tests.

The officers then escorted Kingsland into a police cruiser, informing her that she was being transported to the hospital for treatment and more tests.[4] She was instead taken into custody and brought to a DUI testing facility. At the police station, the defendants and other officers accused her of running a red light and causing the accident.

Although Officer Valenzuela says that he always suspected that Kingsland was under the influence of cannabis and later charged her with that offense, Kingsland stated that she was charged with driving under the influence of alcohol upon arriving at the station. Kingsland asserts that the officers told her they knew she was drunk and had been driving drunk. They performed between two and four Breathalyzer tests, all of which came back negative–with a 0.000% alcohol content. When the Breathalyzer results came back, the officer who was writing on a form asked another officer what he should then write. The second officer told the first officer to write that Kingsland had a strong odor of cannabis emitting

---

[4] Kingsland's passengers were left at the scene of the accident.

6

from her breath.  At that point, the first officer threw away the form he was writing on and started writing on a new form.[5]

After she passed the Breathalyzer tests, Kingsland continued telling the officers that she did not abuse drugs and that she felt sick.  Officer Valenzuela then requested that a drug test be performed on Kingsland.  Officer Robert Jenkins of the Miami Beach Police Department responded and performed more tests on Kingsland, including walking a straight line, touching her nose, and closing her eyes while extending her arms.  Officer Jenkins determined that Kingsland's normal facilities were impaired and obtained a urine specimen from her.

Kingsland was then handcuffed, transported to the Dade County jail, and charged with DUI.[6]  Her father posted a $1,000.00 bond the following day, and she

---

[5] The arrest affidavit, which was signed by Officer Balikes, states that Kingsland "ran the red light . . . and collided with a [sic] unmarked police unit," and that she was "observed with bloodshot eyes, slurred speech, and a strong odor of cannabis emitting from her breath." Although the arrest affidavit was completed after the Breathalyzer tests had been administered, the affidavit contains no mention of the negative Breathalyzer results.  Instead, in the area in which the officer was to mark whether the arrestee was under the influence of alcohol, a box was checked to indicate that the answer was unknown.

Kingsland denies that there was any odor of cannabis on her person or in the truck.  She disputes without supporting evidence whether she had bloodshot eyes and slurred speech, and implies that the officers included these allegedly false facts to support their case for her arrest. Further, she claims that if she did in fact exhibit these characteristics, they resulted from the trauma of the accident and her subsequent continual crying.

[6] While incarcerated, Kingsland's eyes began dilating and constricting, and she began vomiting.  The prison nurse mentioned that she was afraid Kingsland may have suffered a concussion, placed Kingsland in isolation, and checked on her every fifteen to thirty minutes.

was subsequently arraigned on charges of careless driving, reckless driving, and DUI. Kingsland made two trips from New Jersey to Florida to appear in court on these charges.

The defendant officers assert that they never received the laboratory test results, which came back negative for cannabis. They claim that, according to police department policies, drug test results are delivered to the prosecutor and the officer who submits the sample for analysis–in this case, Officer Jenkins.[7]

On February 5, 1996, the prosecutor provided the urine test results to Kingsland's counsel. In May 1996, after two court appearances that resulted in continuances, Kingsland filed a motion to dismiss in light of the drug test results. The charges were dropped on June 6, 1996.

B. Procedural History

Kingsland filed suit under 42 U.S.C. § 1983 against Officers De Armas, Balikes, and Valenzuela, and against the City of Miami, alleging false arrest and malicious prosecution. In *Kingsland v. City of Miami*, No. 99-03393-CV-AJ (S.D. Fla. May 29, 2003), the district court granted summary judgment in favor of the

---

[7] Because Officer Jenkins worked for the Miami Beach police, the City of Miami police department did not receive the test results, despite the fact that the case arose in the City of Miami.

defendants, finding that the officers had probable cause to arrest Kingsland, and that the officers were entitled to qualified immunity on both claims.

Kingsland appeals the district court's grant of summary judgment, arguing that the appellees violated her Fourth Amendment rights and are not entitled to qualified immunity.

## II.  STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court.  *See O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001).  Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  We view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant.  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (citing *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).

## III.  DISCUSSION

*A.  False Arrest*

A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim. *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990). The existence of probable cause at the time of arrest, however, constitutes an absolute bar to a section 1983 action for false arrest. *Id*. at 1505-06. Because this case comes to us on summary judgment, we need only decide whether the defendants carried their burden of demonstrating, as a matter of law, that probable cause existed to arrest Kingsland.

Probable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances. *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). "This standard is met when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995)).

### 1. *The Integrity of the Evidence*

If the officers' assessment that Kingsland's eyes were bloodshot, that her speech was slurred, and that either she or her truck smelled of cannabis were undisputed or supported by evidence other than the defendants' testimony, we would have no problem agreeing with the district court's conclusions. The record,

however, contains evidence that contradicts each of these findings and is sufficient to overcome summary judgment.

Principally, the defendant officers based their arrest in part on their allegation that they detected an odor of cannabis emanating from either Kingsland's breath, her person, or her vehicle. However, Kingsland claims that she did not engage in illegal drug activity on the day of the accident or on any other day, and hence, that the officers could not have detected any such odor prior to her arrest. At the outset, the district court erred in failing to recognize in Kingsland's complaint the assertion that the defendants fabricated evidence to support probable cause.

We find it significant that Kingsland is able to support her assertions of fabrication with the following facts: (1) despite supposedly detecting an odor of cannabis, the officers chose not to conduct a search of Kingsland's vehicle, her person, or her passengers to corroborate their testimony; (2) the officers did not call in drug-sniffing dogs to confirm their suspicions of drug use; (3) no drugs were ever found or produced; (4) Kingsland tested negative for cannabis; (5) Kingsland's vehicle was not impounded as evidence, nor was her allegedly odoriferous clothing retained; (6) the defendants stated in their arrest affidavit that Kingsland ran the red light, allegedly without taking statements from available

11

witnesses or from Kingsland herself; and (7) the officers decided to charge Kingsland with DUI-cannabis rather than DUI-alcohol, and simultaneously destroy an initial arrest affidavit, only after she passed Breathalyzer tests.[8] In sum, the defendants appear to lack any corroborating evidence to support their testimony that an odor of cannabis was present, whereas Kingsland is able to support her assertions with ample circumstantial evidence.

In finding both probable cause and reasonable suspicion to conduct a field sobriety test on Kingsland, the district court stated:

> Officers Valenzuela and Balikes detected an odor of cannabis emanating from [Kingsland's] truck. Ms. Kingsland denied that *she* smelled of cannabis, but she has no evidence to contradict the testimony of Officers Valenzuela and Balikes about the truck's odor.
> . . . .
> Even though Ms. Kingsland did not smell of cannabis – I credit her version of events instead of Officer Valenzuela's and Officer Balikes' – she has no evidence to contradict the testimony of Officers Valenzuela and Balikes that there was an odor of cannabis from the truck.

*Kingsland*, No. 99-03393-CV-AJ, slip op. at 6, 9. We have several concerns about this reasoning.

---

[8] In contrast, we are mindful that a court need not entertain conclusory and unsubstantiated allegations of fabrication of evidence. *See, e.g., Cunningham v. Gates*, 229 F.3d 1271, 1291-92 (9th Cir. 2000) (dismissing plaintiffs' conclusory allegations of fabrication where the plaintiffs produced "not an iota of evidence" to suggest that the defendant officers fabricated evidence).

First, the record contains conflicting accounts regarding where the odor of cannabis originated. On the arrest affidavit, Officer Balikes stated that Kingsland "was observed with . . . a strong odor of cannibis [sic] emitting from her breath." However, the arrest affidavit makes no mention of a cannabis odor emanating from the truck. Moreover, Officer Valenzuela, a DUI specialist, testified that he has trouble smelling cannabis on a person's breath, and instead indicated that he detected a "slight odor" of cannabis on Kingsland's person. Thus, there are genuine issues of fact regarding (1) whether there was any odor at all, and (2) if there was an odor, whether it radiated from the truck, from Kingsland's person, or from Kingsland's breath.

Second, we note that the plaintiff has proffered no less evidence regarding the presence or absence of a cannabis odor than the defendants have. The plaintiff's word is merely countered by the defendants' testimony. Given the standard of review at the summary judgment stage, we must accept Kingsland's version of the facts as true. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002) (stating that a court must accept the non-movant's version of disputed facts as true for purposes of summary judgment). Therefore, the district court improperly accepted as true the defendants' allegation that the truck smelled of cannabis, and erroneously used this fact to support summary

13

judgment in the defendants' favor. Whether an odor of cannabis was indeed emanating from the truck is a genuine issue of material fact suitable for consideration by a jury.

Third, the district court incorrectly concluded that Kingsland has no evidence to contradict the officers' testimony regarding the truck's odor. As detailed above, Kingsland *has* presented circumstantial evidence to support her assertion that the truck did not smell of cannabis. Furthermore, though the defendants' allegation that a cannabis odor was present could potentially have been verified with direct evidence, it is incongruous to expect the plaintiff to prove a negative – the absence of an odor.

While laboratory tests have proven that Kingsland was drug-free at the time of her arrest, the defendants have proffered no objective evidence that drugs were present, either on Kingsland's person or in her truck. We find it incredible that the officers failed to conduct a search of Kingsland's vehicle or summon drug-sniffing dogs upon detecting the "strong odor" of a narcotic, the mere possession of which is illegal. *See, e.g., United States v. Reeh*, 780 F.2d 1541, 1543 n.1 (11th Cir. 1986) ("After a member of the [Coast Guard] detected the odor of marijuana, a search ensued during which the marijuana was discovered."). Presumably, if cannabis were present, such evidence would warrant a drug possession charge.

14

Finally, it is unclear why the district court chose to credit Kingsland's testimony that she did not smell of cannabis, and yet chose not to accept her assertions that the truck likewise did not smell of cannabis.

We cannot allow a probable cause determination to stand principally on the unsupported statements of interested officers, when those statements have been challenged and countered by objective evidence.[9]

### 2. *The Sufficiency of the Investigation*

Next, we consider whether the defendants' investigation was constitutionally deficient. Appellant argues that the district court erroneously concluded as a matter of law that the officers conducted a constitutionally-sufficient investigation, thereby removing the inquiry from a jury. She contends that, objectively, officers should not be permitted to turn a blind eye to

---

[9] It is important to note that this is a unique and exceptional case wherein the investigating officers were responding to a call made by a fellow officer on his police radio, to an accident involving that very officer. Kingsland complains of a conflict of interest and suggests a possible motive for allegedly covering up a fellow officer's wrongdoing. *Cf. Stone v. City of Chicago*, 738 F.2d 896 (7th Cir. 1984) (finding evidence sufficient to support jury verdict in favor of plaintiffs on conspiracy claim under 42 U.S.C. § 1985 where plaintiffs were involved in collision with officers). We consider the evidence on a motion for summary judgment in the light most favorable to Kingsland as the nonmoving party, although at the conclusion of the case, the evidence may establish that the defendant officers acted reasonably. We do not ourselves suggest that the officers engaged in fabrication, but we must accept the plaintiff's allegations as true for purposes of summary judgment.

15

exculpatory information that is available to them, and instead support their actions on selected facts they chose to focus upon. We agree.

In *Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir. 1988), the Fourth Circuit stated:

> [A qualified immunity analysis] must charge [the officer] with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances. . . . "[A] police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (officer must be held to knowledge of reasonably discoverable information bearing upon probable cause to arrest for child neglect).

*Sevigny*, 846 F.2d at 957 n.5. Because the officer in *Sevigny* made an arrest without heeding certain, easily obtained information, the Fourth Circuit held that the officer failed to act reasonably. *Id.* at 957. The court articulated that the officer "simply did not bother to do what any police officer acting reasonably in the circumstances would have done to clarify the factual situation" and that "[t]here was no exigency which prevented his doing so." *Id.* at 958. Kingsland asserts that the same situation presents itself here. She maintains that the district court's conclusion that the investigation was sufficient to form a basis for probable cause implies that "no good-faith investigation whatsoever is required to satisfy this standard." Initial Brief of Appellant at 22.

The district court focused on the reasonableness of Kingsland's arrest given what the officers *did* investigate, ignoring the fact that they may have subjectively failed to investigate both sides of the story. On the other hand, Kingsland argues (and *Sevigny* implies) that officers must investigate objectively and consider all information available to them at the time.[10] While the constitutional reasonableness of a police investigation does not depend on an officer's subjective intent or ulterior motive in conducting the investigation, s*ee, e.g., Whren v. United States*, 517 U.S. 806, 812-13 (1996), it does not follow that the officer may then investigate selectively. The Fourth Circuit's approach serves to deter dishonest officers from fabricating charges to cover up improper detentions by including only selective evidence in their reports.

We recognize, however, that a police officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). Nevertheless, an officer may not choose to ignore information that has been offered to him or her, such as Kingsland's assertions that she was injured and that

---

[10] We are aware that officers are not required to perform error-free investigations or independently investigate every proffered claim of innocence. *See Baker v. McCollan*, 443 U.S. 137, 145-46 (1979). However, that is a separate inquiry than the narrow question presented here. Here, Kingsland alleges that the defendants turned a blind eye to immediately available exculpatory information, improperly choosing to gather information that would exonerate Officer De Armas in a biased manner.

17

Officer De Armas ran the red light. Nor may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts, such as whether there was cannabis in the truck or whether witnesses were available to attest to who was at fault in the accident.

The lack of corroboration through independent police work of De Armas's allegation that Kingsland was at fault in the accident is noteworthy in our probable cause analysis. *Cf. Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (finding no probable cause where arresting officer relied on unsubstantiated informant's tip, failed to take any independent steps to investigate the tip, and did not have any evidence which would have corroborated the tip).

Appellees rely on the Seventh Circuit's decision in *Qian v. Kautz*, 168 F.3d 949 (7th Cir. 1999), to support their assertion that they possessed probable cause for Kingsland's arrest. In *Qian*, the court held that a police officer had probable cause to make a DUI arrest where (1) the officer observed that a driver had lost control of his car and crashed, (2) the driver was slumped over and had difficulty walking, (3) the inside of the car showed no signs of a violent impact or that the driver's body had hit anything during the accident, (4) the driver denied being injured and showed no physical signs of injury, (5) the driver's speech seemed slurred, and (6) the officer did not know anything about the driver's preexisting

18

head injury, which caused his impairment. *Id*. at 952-53. The defendants assert that, as in *Qian*, they reasonably relied on their experience in concluding that Kingsland's behavior most likely resulted from drug intoxication. However, *Qian* is distinguishable in a number of significant respects. First, Qian crashed his own vehicle without apparent reason and so was clearly at fault, whereas the question of fault in Kingsland's collision is unclear and disputed. Second, the responding officer in *Qian* searched the vehicle for signs of injury and for drugs or alcohol before making an arrest, while the defendant officers did neither before arresting Kingsland. Third, the officer in *Qian* asked the driver several times if he was okay, and the driver denied any injury and showed no outward signs of injury. In contrast, Kingsland alleges that, despite her pronouncements of injury and her visible signs of injury, the defendants denied her medical attention and altogether ignored her injuries. Fourth, Qian was not involved in a collision with a police officer, thereby assuaging concerns of concealment and impropriety. Fifth, unlike Kingsland, Qian did not make any allegations of fabrication. Lastly, the plaintiff's injuries in *Qian* were preexisting and did not appear to be caused by the crash, whereas it was purportedly evident that Kingsland's injuries were incurred during the accident with Officer De Armas.

19

It is clear that the defendant in *Qian* made a good faith effort to discover information that would have helped clarify the situation he was presented with. On the contrary, a reasonable jury could find that the appellees' investigation was deficient in that the officers consciously and deliberately did not make an effort to uncover reasonably discoverable, material information. Given that a probable cause determination is based on the totality of the circumstances, the conditions surrounding and leading up to an arrestee's outward manifestations, and not those manifestations alone, factor into the determination. Thus, an officer may not exclusively rely on the outward signs that an individual is exhibiting, without considering them in the context of their surrounding circumstances. *See Rankin*, 133 F.3d at 1435 (stating that probable cause is examined under the totality of circumstances); *cf. Dorman v. Florida*, 492 So. 2d 1160, 1162 (Fla. 1986) (finding no probable cause to administer a blood alcohol test where officer knew the defendant had been involved in a collision, observed that the defendant's eyes were red and watery and that the defendant had been crying, and did not smell alcohol on defendant's breath).

We do not dispute that, in certain situations, an officer may have probable cause to arrest a person if the person was dizzy, performed poorly on field sobriety tests, and exhibited bloodshot eyes and slurred speech. However, the presence of

these characteristics cannot be viewed in the absolute and cannot be separated and isolated from their immediate surrounding circumstances. For example, if an officer has no reason to believe that the individual has suffered any trauma to cause these conditions, then a finding of probable cause for DUI would not be dubious. *See generally Qian*, 168 F.3d 949. In contrast, if the investigating officers are fully aware that the person who exhibits such characteristics has, just moments before, been involved in a forceful automobile collision, has been crying, and has complained of injury, then the presence or absence of probable cause is more ambiguous. Here, the officers found Kingsland sitting in a pile of debris from the collision, and Kingsland allegedly outright told them that she had suffered injuries, including head trauma. In fact, Officer Valenzuela conceded that her behavior was consistent with that of an accident victim. [D.E. 25-1 at 13]. In any event, Kingsland disputes that she had bloodshot eyes and slurred speech, and we must accept her version of the facts as true for purposes of summary judgment.

The parties dispute the conduct of the defendants leading up to Kingsland's arrest. Under Kingsland's version of the events, the defendants did not act in an objectively reasonable manner under the totality of the circumstances. It was within the officers' knowledge that Kingsland was involved in an accident, was injured and crying, and faulted Officer De Armas. It may also have been within

21

the officers' knowledge that no evidence of drug use existed in Kingsland's truck or on her person. Yet, Kingsland has come forward with some evidence here that the defendants chose to either ignore or misrepresent those facts, which, if true, makes the information on which they based their arrest less than "reasonably trustworthy" under the circumstances.[11]

Because we find that there are genuine issues of material fact as to whether the defendants (1) manufactured probable cause, (2) failed to conduct a reasonable investigation, and (3) ignored certain facts within their knowledge, we cannot conclude as a matter of law that probable cause existed to arrest Kingsland. Thus, viewing the evidence in the light most favorable to the plaintiff, summary judgment is inappropriate on the merits of the false arrest claim.

### 3. *Qualified Immunity*

If the defendant officers are entitled to qualified immunity with respect to the plaintiff's claim of false arrest, we must affirm summary judgment in their favor. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly

---

[11] We recall that probable cause requires that "'the facts and circumstances *within the officer's knowledge*, of which he or she has *reasonably trustworthy information*, would cause a *prudent* person to believe, *under the circumstances shown*, that the suspect has committed, is committing, or is about to commit an offense.'" *Rankin*, 133 F.3d at 1435 (citation omitted) (emphasis added).

established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity represents a balance between the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the fear of constant, baseless litigation.  *GJR Inv., Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998).

The essence of qualified immunity analysis is the public official's objective reasonableness, regardless of his underlying intent or motivation.  *See Harlow*, 457 U.S. at 819; *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002).  If reasonable public officials could differ on the lawfulness of the defendants' actions, the defendants are entitled to immunity.  *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003).  However, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Harlow*, 457 U.S. at 819.  Qualified immunity "gives ample room for mistaken judgments" but does not protect "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986).

23

To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (citation and internal quotation marks omitted). Here, it is undisputed that Officers Valenzuela and Balikes were acting within the course and scope of their discretionary authority when they arrested Kingsland. "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.*

The Supreme Court has held that qualified immunity analysis involves two discrete queries. First, we must decide whether the facts alleged, assuming they are true, demonstrate that the defendants violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If this is answered in the affirmative, we proceed to the second query, which is to determine whether the right violated was clearly established. *See id.* We conclude that Officers Balikes and Valenzuela are not entitled to qualified immunity on the false arrest claim.

"Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003) (citing *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)). As discussed above, we cannot conclude as a matter

of law that probable cause existed to arrest Kingsland. Likewise, falsifying facts to establish probable cause is patently unconstitutional and has been so long before Kingsland's arrest in 1995. *See, e.g., Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997) ("It was well established in 1989 that fabricating incriminating evidence violated constitutional rights."); *see also Hinchman v. Moore*, 312 F.3d 198, 205-06 (6th Cir. 2002) (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)). So, the defendants were on notice in 1995 that manufacturing probable cause is unconstitutional. The facts in the record, interpreted in the light most favorable to Kingsland, sufficiently allege a violation of her clearly established Fourth Amendment right to be free of warrantless searches and seizures.

Nevertheless, officers who make an arrest without probable cause are entitled to qualified immunity if there was arguable probable cause for the arrest. *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999). Accordingly, we must inquire whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff . . . ." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990). Kingsland must demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances. *See Storck*, 354 F.3d

25

at 1313. As discussed, there are several questions of fact regarding the information the defendants possessed or could have possessed had they chosen to investigate as a reasonable officer would have done. Without further factfinding, it is impracticable to conclude that arguable probable cause existed for Kingsland's arrest when it is unclear how much of the proffered evidence tending to support a finding of arguable probable cause was manufactured or misrepresented, or what further knowledge, if any, would be attributed to the defendants if they had investigated reasonably.

In granting qualified immunity to the defendants, the district court found the facts of this case to be analogous to those set forth in *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993). In *Post*, we granted qualified immunity where government agents inspecting a restaurant made an improper arrest for a building code violation. *Id.* at 1558. The agents in *Post* claimed that they counted people in excess of the restaurant's maximum capacity, but in effect they erroneously counted employees who were not to be counted. We held that a "mistaken but reasonable count" was sufficient for the agents to establish arguable probable cause. *Id.* However, the agents in *Post* simply made a good faith mistake, whereas here, the officers' conduct creates factual issues as to their honesty and credibility. It was error for the district court to omit the plaintiff's

26

allegations of falsification and knowing lack of probable cause from its analysis.

It is readily apparent that the conduct in *Post* is characteristic of the type of conduct that the policies of qualified immunity seek to protect. In *Post*, the officials made a reasonable mistake in the legitimate performance of their duties, and there were no concerns regarding potential abuse of authority or motivation to make an arrest. *See id.*; *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (officers who reasonably but mistakenly conclude that probable cause existed are entitled to immunity); *Cf. Harlow*, 457 U.S. at 814 ("In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.").

In contrast, Kingsland contends that the defendants made several deliberately false statements to support her arrest, in violation of the law. She cites *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003), in which we held that qualified immunity "does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Id.* at 1077 (citations and internal quotations omitted). In *Holmes*, we reversed the grant of qualified immunity and summary judgment to police officers where there existed factual questions regarding whether the officers filed a recklessly false application

for an arrest warrant. *Id*. at 1083-84. Based on the facts of the case, the panel found that the district court could not conclusively determine that the officer's affidavit was not made in "reckless disregard of the truth." *Id.* at 1084. Likewise, there are questions of fact in this case regarding the integrity of the evidence which is to form the basis of an arguable probable cause determination.

Viewed in the light most favorable to Kingsland, the facts support a conclusion that the arrest affidavit included recklessly or deliberately false statements that are material to a finding of arguable probable cause. If the defendants fabricated or unreasonably disregarded certain pieces of evidence to establish probable cause or arguable probable cause, as alleged, reasonable officers in the same circumstances and possessing the same knowledge as the defendants could not have believed that probable cause existed to arrest the plaintiff. Because a jury question exists as to whether the defendants constructed evidence upon which to base Kingsland's arrest, the question whether arguable probable cause for the arrest existed is aptly suited for a jury.

Qualified immunity is, as the term implies, qualified. It is not absolute. It contemplates instances in which a public official's actions are not protected. *See Madison v. Gerstein*, 440 F.2d 338, 341 (5th Cir. 1971) ("As a law enforcement officer, defendant . . . does not enjoy the cloak of immunity of the quasi-judicial

28

prosecuting attorney."); *see also Butz v. Economou*, 438 U.S. 478, 506-07 (1978) ("[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment."). The principles behind qualified immunity would be rendered meaningless if such immunity could be invoked to shelter officers who, because of their own interests, allegedly flout the law, abuse their authority, and deliberately imperil those they are employed to serve and protect. In fact, if the plaintiff's version of the facts is true, the defendants' conduct is patently objectively unreasonable and no reasonable public official would contend that such conduct was lawful. "[H]ad the officers . . . displayed the courtesy, professionalism, and respect citizens have the right to expect, they would not have acted with the unbridled arrogance of those who believe they will never be held accountable for their behavior." *O'Rourke v. Hayes*, --- F.3d ----, 2004 WL 1662295, at *8 (11th Cir. July 27, 2004). Viewed in the light most favorable to Kingsland, the evidence shows that the arresting officers in this case behaved in an objectively unreasonable fashion and were therefore not entitled to qualified immunity. Given the significance of the disputed issues of fact here, qualified immunity from suit is effectively unavailable, even though after a full trial the officers may yet prevail

29

on the merits. Consequently, her suit against the defendants on the false arrest claim may proceed.

B. *Malicious Prosecution*

Kingsland also asserts a § 1983 claim for malicious prosecution based on the defendants' alleged fabrication of evidence against her, their alleged failure to consider potentially exculpatory information, and their alleged refusal to investigate impartially. Kingsland maintains that, due to the officers' improper actions, the prosecutor was presented with false and misleading information. She avers that criminal prosecution was a natural consequence of the defendants' purportedly deceptive account of the accident and its surrounding circumstances.

To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures. *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003), *cert. denied*, 124 S. Ct. 298 (2003).

*1. The Common Law Elements of Malicious Prosecution*

Under Florida law, a plaintiff must establish each of six elements to support a claim of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the

legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding. *Durkin v. Davis,* 814 So. 2d 1246, 1248 (Fla. Dist. Ct. App. 2002) (citing *Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217 (Fla. 1986)). Only the fourth and fifth elements are at issue here: whether there was an absence of probable cause for the original criminal proceeding, and whether there was malice on the part of the defendants.

"It is well settled that in an action to recover damages for malicious prosecution where, as here, the evidence is in dispute, the existence or non-existence of malice and want of probable cause are questions of fact for the jury." *Good Holding Co. v. Boswell*, 173 F.2d 395, 399 (5th Cir. 1949).[12] Consequently, because Kingsland challenges the legitimacy of the relevant evidence, concerns regarding the fulfillment of the fourth and fifth elements for the common law tort of malicious prosecution are rightly reserved for the jury.

2. *Fourth Amendment Seizure*

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 12, 1981.

31

Next, Kingsland bears the burden of proving that she was seized in relation to the prosecution, in violation of her constitutional rights. In the case of a warrantless arrest, the judicial proceeding does not begin until the party is arraigned or indicted. *See, e.g., Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) ("[T]he existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest."). Thus, the plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to the time of arraignment, and was "not one that arose from malicious prosecution as opposed to false arrest." *Id*. at 254 n.26.

The district court held that Kingsland was subjected to a "continuing seizure" for Fourth Amendment purposes because she was required to (1) pay a $1,000 bond; (2) appear at her arraignment; and (3) make two trips from New Jersey to Florida to defend herself in court, pursuant to the authority of the state. *See Albright v. Oliver*, 510 U.S. 266, 276-79 (1994) (plurality opinion) (Ginsburg, J., concurring) (stating that a malicious prosecution claim could be found under the Fourth Amendment in that a defendant remains seized for trial so long as he is obligated to appear in court and answer the state's charges). *But see Wilkins v.*

32

*May*, 872 F.2d 190, 194 (7th Cir. 1989) (rejecting the concept of continuing seizure).

In her concurrence in *Albright*, Justice Ginsburg explained her view that a criminal defendant facing pending prosecution remains "continually seized" for Fourth Amendment purposes – even if the defendant was never arrested. According to Justice Ginsburg:

> A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense. A defendant incarcerated until trial no doubt suffers greater burdens.
> That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to appear in court and answer the state's charges. He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court.

*Albright*, 510 U.S. at 278-79 (Ginsburg, J., concurring).

Notwithstanding the eminence of its sponsor, our circuit has previously noted that we have doubts about the viability of this theory. *See Whiting*, 85 F.3d

33

at 584 (stating "[w]e also have questions about the ["continuing seizure"] theory . . . ." and acknowledging the Seventh Circuit's post-*Albright* rejection of the "continuing seizure" theory in *Reed v. City of Chicago*, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996)). A number of our sister circuits have addressed the theory, and none have been willing to conclude that normal conditions of pretrial release constitute a "continuing seizure" barring some significant, ongoing deprivation of liberty, such as a restriction on the defendant's right to travel interstate. *Compare, e.g., Nieves v. McSweeney*, 241 F.3d 46, 56-57 (1st Cir. 2001) (holding that plaintiffs suffered no post-arraignment seizure because of the "relatively benign nature" of their pretrial release conditions), *and Reed*, 77 F.3d at 1052 n.3 (rejecting theory that defendant could remain seized for trial so long as he was bound to appear in court and answer the state's charges), *with Evans v. Ball*, 168 F.3d 856, 860-61 (5th Cir. 1999) (holding that a plaintiff had alleged Fourth Amendment seizure where, in addition to being summoned to appear and answer to criminal charges, plaintiff was forced to sign personal recognizance bond, and was required to report regularly to pretrial services and obtain permission before leaving the state), *and Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (finding seizure where plaintiff was required to post $10,000 bond, attend all court hearings, maintain weekly contact with pretrial services, and refrain from

34

traveling outside New Jersey and Pennsylvania), *and Murphy v. Lynn*, 118 F.3d 938, 945 (2d Cir. 1997) (holding that plaintiff's obligation to attend court appointments, combined with prohibition against leaving New York, constituted Fourth Amendment seizure).  While we sympathize with Kingsland's anxiety and inconvenience, assuming the facts in her complaint to be true, we cannot go so far as to say that the conditions of her pretrial release – which did not constitute a significant deprivation of liberty – constituted a seizure violative of the Fourth Amendment.  *See, e.g., Myers v. Shaver*, 245 F. Supp. 2d 805, 812 (W.D. Va. 2003) ("Though a summons may impose a burden, a defendant summoned to appear in a criminal case faces no greater restraint than the person summoned for any number of a host of civic responsibilities.").

Because Kingsland cannot prove a violation of her Fourth Amendment right to be free from unreasonable seizures, she does not have a cognizable claim for malicious prosecution, and the defendants are entitled to summary judgment on the merits of such claim.

Accordingly, we reverse the district court's grant of summary judgment on Kingsland's false arrest claim, affirm the grant of summary judgment on the malicious prosecution claim, and remand for proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.